IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| PUEBLO OF LAGUNA; PUEBLO OF JEMEZ,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL REGAN, in his official capacity as Administrator of the United States Environmental Protection Agency; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; TAYLOR N. FERRELL, in his official capacity as Acting Assistant Secretary of the Army for Civil Works; UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>Defendants. | No.<br><br>COMPLAINT FOR VIOLATIONS of the ADMINISTRATIVE PROCEDURE ACT; the CLEAN WATER ACT; and FEDERAL TRUST RESPONSIBILITIES. |

## I.    INTRODUCTION

1.    The Pueblo of Laguna and the Pueblo of Jemez (together "the Pueblos") are both federally recognized tribes that have resided on lands now within the state of New Mexico since time immemorial.

2.    For both Pueblos, waters that flow through their lands are necessary for domestic and agricultural uses. Such waters are also essential for cultural and ceremonial practices. The Pueblo of Laguna depends on clean water for irrigation and domestic purposes, and its traditions include ceremonial practices in which members of the Pueblo consume water. The Pueblo of Jemez likewise utilizes clean water for agriculture and domestic purposes, and its water supports

uses including ceremonial and cultural practices, hunting and fishing, as well as domestic, municipal, commercial, and industrial uses.

3.　　The Pueblos are located in New Mexico, in the arid southwest United States, where water is scarce and therefore of special value. Any water pollution in and around the Pueblos has a disproportionate impact because of the scarcity and preciousness of the resource in the region.

4.　　Most of the geography surrounding the Pueblos is inscribed by arroyos—gullies carved into the earth by flowing water that for more than a millennium have served as channels for life-giving water in times of rain or snowmelt. Each arroyo, ditch, ephemeral stream, waterway, and acequia with the hydrologic capability to facilitate water flow, regardless of the continuity of that flow, is a vein of life for the Pueblo communities. These conveyances bring water into the lands of the Pueblos and, with it, any pollutants introduced into waterways upstream of or hydrologically connected to the Pueblos' watersheds.

5.　　Congress enacted the Clean Water Act ("CWA") with the objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Among the CWA's main requirements is the prohibition of unpermitted discharge of pollutants into "navigable waters," defined as "waters of the United States, including the territorial seas." 33 U.S.C. §§ 1311(a), 1362(7).

6.　　The CWA charges the U.S. Environmental Protection Agency ("EPA") and the Army Corps of Engineers ("Corps") (together, "the Agencies") with implementation of the CWA's pollution protection programs. *See* 33 U.S.C. §§ 1342(a), 1344 (giving the EPA and the Corps authority over the major permitting schemes); *see also* 33 U.S.C. § 1319 (generally giving

the Administrator of the EPA the right to enforce); 33 U.S.C. § 1319(g)(1)(B) (granting limited

enforcement power to the Secretary of the Army). Because the CWA does not define "waters of

the United States," the Agencies have interpreted the term in order to establish which waters are

protected by the CWA. *See Orchard Hill Bldg. Co. v. U.S. Army Corps of Eng'rs,* 893 F.3d

1017, 1020 (7th Cir. 2018); *see also* 33 C.F.R. § 328.3 (the Corps' definition of "waters of the

United States") and 40 C.F.R. § 120.2 (the EPA's definition of "waters of the United States").

7.      Historically, the Agencies have interpreted "waters of the United States" broadly,

in keeping with the text, structure, and purpose of the CWA, although that interpretation has

been updated over time in response to scientific advances and judicial decisions. *See United*

*States v. Hubenka*, 438 F. 3d 1026, 1030–31 (10th Cir. 2006) ("As the Supreme Court has

recognized, 'Congress chose to define the waters covered by the [CWA] broadly.'" (quoting

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985)); *Nat. Res. Def.*

*Council, Inc. v. Callaway*, 392 F. Supp. 685, 686 (D.D.C. 1975) (finding that Congress intended

the definition of "waters of the United States" to be broader than the traditional definition of

"navigable waters"); Clean Water Rule: Definition of "Waters of the United States," 80 Fed.

Reg. 37,053 (June 29, 2015) (issuing a new rule defining "waters of the United States" in

response to scientific data) [hereinafter the 2015 Clean Water Rule].

8.      The Supreme Court interpreted "waters of the United States" in *Rapanos v.*

*United States*, 547 U.S. 715 (2006). Justice Scalia's plurality opinion found that CWA

jurisdiction did not extend to the wetlands in question, relying on a dictionary definition of

"waters" as modified by the word "the" to conclude that the term "the waters of the United

States" could "confer[] jurisdiction only over relatively permanent bodies of water." *Id.* at 739.

9.      Justice Kennedy's concurrence in judgment supported a "significant nexus" test, finding CWA jurisdiction where the water or wetland "either alone or in combination with similarly situated [wet]lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780. As such, the Supreme Court's ruling in *Rapanos* rendered both the "Scalia test" and Justice Kennedy's "significant nexus" test as valid for determining "waters of the United States."

10.     Several federal Circuit Courts of Appeals have subsequently followed Justice Kennedy's test. *See, e.g.*, *United States v. Gerke Excavating, Inc.,* 464 F.3d 723, 724 (7th Cir. 2006) (per curiam); *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 995 (9th Cir. 2007); *United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007).

11.      In 2015, the Agencies promulgated the Clean Water Rule, which relied on a thorough survey of the best available science to determine which bodies of water were "waters of the United States" under the significant nexus test. 80 Fed. Reg. at 37,060. In keeping with historic practice and based on clear science, the 2015 Clean Water Rule determined that many of the ephemeral and intermittent streams,[1] such as those common on the lands of the Pueblos, were "waters of the United States."

12.     In 2017, President Donald J. Trump issued an Executive Order directing the Agencies to repeal the Clean Water Rule and consider replacing it with a regulation employing

---

[1] Ephemeral streams flow only in response to precipitation whereas intermittent streams flow continuously only at certain times of the year, for example, only flowing in the spring after snowmelt. U.S. Envtl. Prot. Agency, The Ecological and Hydrological Significance of Ephemeral and Intermittent Streams in the Arid and Semi-arid American Southwest 6 (2008).

the narrower approach and reasoning of Justice Scalia's plurality opinion in *Rapanos*. Exec. Order No. 13,778, 82 Fed. Reg. 12,497 (Mar. 3, 2017).

13.     The Agencies repealed the 2015 Clean Water Rule and then reversed their longstanding policy by promulgating a new, much narrower interpretation of the "waters of the United States." Definition of "Waters of the United States" — Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) [hereinafter the 2019 Repeal Rule]; The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) [hereinafter the 2020 Navigable Waters Rule]. The 2020 Navigable Waters Rule follows the directive of Executive Order 13,778, but without due regard for established law.

14.     The 2019 Repeal Rule and 2020 Navigable Waters Rule are inconsistent with both the CWA's objective of "maintain[ing] the chemical, physical, and biological integrity of the Nation's waters" and the *Rapanos* significant nexus test.

15.     The 2019 Repeal Rule and the 2020 Navigable Waters Rule harm the Pueblos by removing federal CWA water pollution protections from many of the ephemeral streams and other waterbodies that sustain the Pueblos. These rules remove CWA protections from 79% to 97% of stream miles in the Pueblo of Laguna. These rules remove CWA protections from 94% of stream miles in the Jemez watershed and 87% of stream miles on Jemez Pueblo trust lands.

16.     Where a waterbody is not determined to be a "water of the United States," the Pueblos alone are left to establish and administer water pollution control programs at their own expense.

17.     However, the Pueblos rely on the Agencies to implement nearly all of the CWA's pollution programs on their behalf and do not have the financial or administrative resources or capacity to administer these programs themselves.

18.     Further, both Pueblos rely on the federal jurisdiction of the CWA to protect themselves from upstream pollution.

19.     For the Pueblos, high water quality is essential to day-to-day life, as well as cultural and religious practices.

20.     The removal of federal jurisdiction creates the imminent risk of the degradation and destruction of the Pueblos' waters and would harm the Pueblos' agriculture, as well as cultural and religious practices.

21.     The Agencies promulgated both the 2019 Repeal Rule and the 2020 Navigable Waters Rule without due respect to the sovereignty of either Pueblo.

22.     The Agencies' actions violated the Administrative Procedure Act ("APA"), the CWA, and the federal trust responsibility toward tribes, as described herein.

23.     The Pueblos respectfully request that the Court vacate and set aside the 2019 Repeal Rule and 2020 Navigable Waters Rule and return to the post-*Rapanos* case-by-case application of the "significant nexus" test.

## II.     JURISDICTION AND VENUE

24.     This Court has jurisdiction over the claims set forth in this complaint pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1362, and 5 U.S.C. § 702. *See Nat'l Ass'n of Mfrs. v. U.S. Dep't of Def.*, 138 S. Ct. 617, 623 (2018) (holding that challenges to the Agencies' regulations defining "waters of the United States" must be brought in federal district courts).

25.     The relief sought is authorized by 28 U.S.C. § 2201(a), 28 U.S.C. § 2202, and 5 U.S.C. § 706.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(2) and (e)(1). This action seeks relief against federal agencies and federal officers acting in their official capacities. Additionally, venue is proper because a substantial part of the property, including water resources, that is the subject of the action is situated within this judicial district. 28 U.S.C. § 1391 (e)(1)(B).

### III.   PARTIES

#### A.  Pueblo Petitioners

27.     Petitioners, Pueblo of Jemez and Pueblo of Laguna, are both federally recognized American Indian tribes with a government-to-government relationship with the United States. Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 86 Fed. Reg. 7554, 7556 (Jan. 29, 2021).

28.     Unlike many other Indian tribes in the United States, the Pueblos were never removed from the land they have held since time immemorial and have retained their property rights to their lands. *See e.g.*, Treaty of Guadalupe Hidalgo, Feb. 2, 1848, 9 Stat. 922; *New Mexico v. Aamodt*, 537 F.2d 1102, 1105 (10th Cir. 1976) (*Aamodt I*) (outlining the history of congressional confirmation of Pueblo land and resource rights within New Mexico).

#### 1.  Pueblo of Laguna

29.     The Pueblo of Laguna is located approximately 10 miles west of Albuquerque, New Mexico, with the Pueblo's westernmost boundary approximately 50 miles from Albuquerque.

30.     The Pueblo of Laguna encompasses approximately 500,000 acres of combined restricted fee and United States trust land in Cibola, Valencia, Bernalillo, and Sandoval counties. It includes the six villages of Encinal, Laguna, Mesita, Paguate, Paraje, and Seama.

31.     As of 2020, there are approximately 4,800 members of the Laguna Pueblo within the reservation boundaries, and there are about 8,900 total enrolled members.

32.     The Pueblo of Laguna is located within both the Rio Puerco and Rio San José watersheds. The Rio Paguate also runs through the Pueblo. Each of these three rivers is ephemeral or intermittent.

33.     The people of Laguna have been residing within the watersheds of the Rio Puerco and the San José River and using water from both rivers for irrigation and domestic purposes since before European contact.

34.     Water is essential to Laguna beliefs, cultural practices, ceremonies, and daily activities. Members of the Pueblo of Laguna consume water directly from the rivers as part of domestic uses and for ceremonial practices.

35.     Members of the Pueblo of Laguna are directly affected by upstream water activities that occur beyond the exterior boundaries of the Pueblo and on federal lands.

36.     Ephemeral and intermittent streams are a significant source of surface water for the Pueblo of Laguna.

37.     The Pueblo of Laguna contains approximately 1,795 miles of linear streams. Under the 2015 Clean Water Rule, all 1,795 stream miles within the Pueblo were considered jurisdictional waters and were protected under the CWA. The 2020 Navigable Waters Rule will remove 79% to 97% of stream miles within the Pueblo from protections under CWA jurisdiction.

38.     The Pueblo of Laguna was granted "Treatment in a similar manner as States" ("TAS") status by the EPA for three CWA programs under Section 518(e) of the Act. The Pueblo of Laguna has received TAS status to participate in the Section 106 pollution control grant program, the Section 303(c) water quality standards program, and the Section 401 water quality certification program.

39.     The Pueblo of Laguna has obtained TAS, federally recognized water quality standards, and section 401 certification authority, but must rely on the Agencies and their expertise for permitting and enforcing CWA requirements. These requirements include permit conditions under the National Pollutant Discharge Elimination System ("NPDES") and section 404 dredge-and-fill programs to help protect the Pueblo's water.

40.     The department responsible for water quality at the Pueblo of Laguna consists of one full-time Surface Water Quality Specialist and one part-time employee who assists the Surface Water Quality Specialist with the water quality monitoring program.

41.     The Pueblo of Laguna has relied on the protections of the 2015 Clean Water Rule to protect its water quality standards from degradation by upstream dischargers such as the City of Grants, and the Roca Honda, L-Bar, Homestake, Rio Grande Resources Mount Taylor, and Bluewater uranium mines. The Lee Ranch Coal Company is also located upstream of the Pueblo of Laguna.

42.     According to public census data, the Pueblo of Laguna has an average annual per capita income of $14,743, less than half of the average annual income in the United States, with a poverty rate of 32%, more than double the rate of the United States at 13.4%.

43.     The repeal of the 2015 Clean Water Rule and the promulgation of the 2020 Navigable Waters Rule harm the Pueblo of Laguna by removing the ability to enforce federal water quality standards within nearly all its waterways. The repeal of the 2015 Clean Water Rule and the promulgation of the 2020 Navigable Waters Rule also harm the Pueblo of Laguna by leaving the Pueblo without the capacity or resources to administer its own water quality standards and without the legal authority under the CWA to enforce water quality standards against upstream discharges.

### 2.  Pueblo of Jemez

44.     The modern-day Pueblo of Jemez is located approximately 40 miles northwest of Albuquerque, New Mexico.

45.     The Pueblo of Jemez's reservation encompasses more than 89,000 acres. The Pueblo's land includes lands held in fee with federal restrictions, thereby constituting federal trust lands, federal reservations held by the United States in trust for the Pueblo, and fee lands. These figures do not include Indian aboriginal title lands.

46.     The Pueblo of Jemez is home to more than 3,400 enrolled tribal members.

47.     The Pueblo of Jemez is historically linked to the Pueblo of Pecos, as they were legally merged into one Pueblo by an Act of Congress. Act of June 19, 1936, Pub. L. No. 74-693, 49 Stat. 1528 (1936) (consolidating the Pueblos of Jemez and Pecos). The Pecos culture and traditions have been preserved and incorporated with the Jemez culture, as the Pueblo of Jemez recognizes the Governor of Pecos as their second Lieutenant Governor.

48.     The Pueblo of Jemez is located within the Jemez River watershed, and the Jemez River flows through the Pueblo's lands and jurisdiction. There are 57.5 stream miles located

within the Pueblo of Jemez's reservation, of which 80% are ephemeral streams and 7% intermittent streams. Additionally, there are 888.9 stream miles located outside the Pueblo's reservation lands that are part of the hydrologic systems that have supported Pueblo life for more than a millennium. These waters have a direct effect on the Pueblo and the waters within it.

49.    The Pueblo of Jemez lacks the authority to regulate and protect those hydrologically connected waters outside its jurisdiction, which consist of 80% ephemeral streams and 14% intermittent streams.

50.    The Pueblo of Jemez relies on federal authority under the CWA to protect the waters of the Pecos watershed that lie outside of the Pueblo's jurisdiction.

51.    The Pecos watershed consists of 189,789 acres and is culturally significant to the Pueblo as ancestral homelands. The Pecos watershed consists of 309 stream miles, all of which have a direct effect on the Pueblo way of life and safety.

52.    The Jemez Natural Resources Department manages water and air quality monitoring, in addition to managing the Pueblo of Jemez's forestry, range, wildlife, environmental and cultural compliance, farm services, and overseeing the irrigation system. A department of 22 full-time employees plus a tribal Youth Conservation Corps manages this program.

53.    According to Jemez core beliefs, water is considered the key to life. Throughout time, water has been the greatest predictor of villages, farms, commerce, and other markers of human success.

54.    For the Pueblo, there is a significant connection between the Jemez River and the sustainability of the Pueblo's agriculture and way of life. Given this connection, members of the

Jemez community directly consume and use water from the Jemez River and other streams on and off the reservation as part of daily life and ceremonial practices.

55.     These streams continue to have historic, spiritual, and cultural significance to the Pueblo, and Pueblo members continue to visit and use these waters for ceremonial purposes, including spiritual purposes, which require that a high level of water quality be maintained.

56.     The Pueblo of Jemez currently receives two grants annually from the EPA. One grant is the General Assistance Program that the Pueblo receives because of its TAS status. It also receive a water quality grant to fund the water quality work that includes sampling, written sampling programs, and documentation of best practices.

57.     According to public census data, the Pueblo of Jemez has an average annual per capita income of $15,538, about half the per capita income in Albuquerque, New Mexico. Jemez Pueblo has a poverty rate of 24.8%, about 1.5 times the rate of Albuquerque at 16.2%.

58.     The repeal of the 2015 Clean Water Rule and the promulgation of the 2020 Navigable Waters Rule harm the Pueblo of Jemez by removing its authority to enforce federal water quality standards within waterbodies on and off Pueblo lands that are critical to Pueblo agriculture, culture, and religion.  The repeal of the 2015 Clean Water Rule and the promulgation of the 2020 Navigable Waters Rule also harm the Pueblo of Jemez by leaving the Pueblo without the capacity or resources to administer its own water quality standards and without the legal authority under the CWA to enforce water quality standards against upstream discharges.

**B.  Government Defendants**

59.     Defendant Michael S. Regan is the Administrator of the EPA, and as such is charged with the primary duties and responsibilities of the United States and the EPA, including

as trustee and fiduciary regarding protection of clean air, land, and water under EPA control or responsibility to which federally recognized Indian tribes have rights, including Plaintiff Pueblos.

60.     Defendant United States Environmental Protection Agency is the federal agency charged with primary implementation and enforcement of the CWA. Together with the Corps, EPA promulgated the 2019 Repeal Rule and 2020 Navigable Waters Rule. EPA's responsibilities include duties as trustee and fiduciary regarding protection of clean air, land, and water under EPA control or responsibility to which federally recognized Indian tribes have rights, including Plaintiff Pueblos.

61.     Defendant Taylor N. Ferrell is the Acting Assistant Secretary of the Army for Civil Works, supervising the Corps' Civil Works program, and is trustee and fiduciary regarding implementation of the CWA and management of lands under the Corps' control or responsibility to which federally recognized Indian tribes have rights, including Plaintiff Pueblos.

62.     Defendant United States Army Corps of Engineers is the federal agency responsible for delivering public and military engineering services, and whose Civil Works mission includes regulatory programs and permitting power. The Corps is housed within the United States Army, as part of the United States Department of Defense. Together with the EPA, the Corps promulgated the 2019 Repeal Rule and 2020 Navigable Waters Rule. The Corps' responsibilities include those as trustee and fiduciary regarding protection of clean air, land, and water under the Corps' control or responsibility to which federally recognized Indian tribes have rights, including Plaintiff Pueblos.

## IV.   STATUTORY AND REGULATORY BACKGROUND

### A.  Federal Government Trust Obligations

63.     The United States trust responsibility is one of the oldest and most foundational

doctrines of federal Indian law. *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 13 (1831)

(describing Indigenous tribes as "domestic dependent nations"); *see Worcester v. Georgia*, 31

U.S. (6 Pet.) 515 (1832) (rejecting the State of Georgia's claim of jurisdiction over the Cherokee

Nation and re-affirming the federal government's responsibility to protect the tribes); *United*

*States v. Sandoval*, 231 U.S. 28, 47 (1913) ("[T]he legislative and executive branches of the

government have regarded and treated the Pueblos of New Mexico as dependent communities

entitled to its aid and protection, like other Indian tribes . . . .").

64.     The United States trust responsibility entails recognizing and protecting tribal

lands, assets, and resources, including the water that flows over and through tribal lands, and the

natural resources that depend on that water. *See United States v. Mitchell*, 463 U.S. 206, 225

(1983) (relying on "the undisputed existence of a general trust relationship between the United

States and the Indian people."). The Supreme Court reasoned in *Mitchell*, a case involving the

Bureau of Indian Affairs' control over a tribe's timber resources, that "a fiduciary relationship

necessarily arises when the Government assumes such elaborate control over forests and

property belonging to Indians." *Id.* at 225[2]; *cf.* Criteria and Procedures for the Participation of the

Federal Government in Negotiations for the Settlement of Indian Water Rights Claims, 55 Fed.

---

[2] Further, the Court stated "'where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.'" 463 U.S. at 225 (quoting *Navajo Tribe of Indians v. United States*, 624 F.2d 981, 987 (Ct. Cl. 1980).

Reg. 9223 (Mar. 12, 1990) (the Department of the Interior's express recognition that "Indian water rights are vested property rights for which the United States has a trust responsibility, with the United States holding legal title to such water in trust for the benefit of the Indians.").

65.      In 1913, the United States Supreme Court held that Pueblos are tribes for purposes of federal jurisdiction, and Congress holds the power to "enact laws for the benefit and protection of [Pueblo] Indians as a dependent people." *Sandoval*, 231 U.S. at 48.

66.      As dependent Indian communities, Pueblos are considered Indian Country for which the United States has a "duty of exercising a fostering care and protection." *Id.* at 46; *see also* 18 U.S.C. § 1151.

67.      The Tenth Circuit has acknowledged the United States trust responsibility to the Pueblos. *Aamodt I*, 537 F.2d at 1111 ("Under *Sandoval . . .*, the United States has treated the Pueblos like other Indians. It is their guardian and trustee.").

68.      The United States has recognized its trust responsibility to protect Pueblo water resources in the recent settlement involving the Pueblos of Nambé, Pojoaque, San Ildefonso, and Tesuque. *See* Claims Resolution Act of 2010, Aamodt Litigation Settlement Act, Pub. L. No. 111-291, § 613(c), 124 Stat. 3064, 3141–42 (2010).

69.      In addition, Congress recognized and preserved the priority of Pueblos' water rights in Section 9 of the Pueblo Lands Act of 1933, 48 Stat. 108.

70.      It is the duty of the EPA to "restore and maintain the . . . integrity of the Nation's waters." 33 U.S.C. § 1251(a), (d). The Pueblos' water resources necessarily entail the right to clean water for domestic and ceremonial uses. *Cf.*, *United States v. Washington*, 853 F.3d 946, 965 (9th Cir. 2017) (holding that the State of Washington's construction of culverts blocking

streams necessary for salmon habitat violated tribes' treaty rights because "the Tribes' right of access to their usual and accustomed fishing places would be worthless without harvestable fish.").

71.     Under executive branch policies relating to the trust duty, executive agencies have a duty to meaningfully consult with tribes, consider how agency actions affect tribal rights and resources, and respect tribal self-governance and sovereignty when taking actions that have tribal implications. Exec. Order No. 13,175, 65 Fed. Reg. 67,249, 67,250 (Nov. 9, 2000); Memorandum on Tribal Consultation, 74 Fed. Reg. 57,881 (Nov. 5, 2009) ("executive departments and agencies (agencies) [sic] are charged with engaging in regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications"); Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships, 86 Fed. Reg. 7491 (Jan. 26, 2021) (President Biden recognizing the policy announced in Executive Order 13,175 and continuing commitment to "honoring Tribal sovereignty and including Tribal voices in policy deliberation that affects Tribal communities.").

72.     Executive Order 13,175 requires agencies to "have an accountable process to ensure meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications." 65 Fed. Reg. at 67,250.

73.     These high standards of conduct apply to all executive departments, not just agencies with a "special statutory responsibilit[y]," such as the Bureau of Indian Affairs. *HRI, Inc. v. EPA*, 198 F.3d 1224, 1245 (10th Cir. 2000) (quoting Felix S. Cohen, Handbook of Federal Indian Law 225 (1982 ed.)).

74.     The federal government's trust duty and the policies of the Agencies relating to the trust duty require that the Agencies consider how their rulemakings impact tribal rights and resources. *See Nw. Sea Farms v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515, 1519–20 (W.D. Wash. 1996) (stating that the federal trust obligation imposes a fiduciary duty on "any government action" relating to Indian tribes) (citing *Nance v. EPA*, 645 F.2d 701, 711 (9th Cir. 1981)); *HRI, Inc.*, 198 F.3d at 1245.

75.     The EPA has assumed a trust responsibility to Indian tribes as articulated in the agency's own official policies and procedures. In a 2019 policy statement, the EPA "reiterate[d] its recognition of the unique legal relationship with tribal governments" and "acknowledge[d] the federal government's trust responsibility to tribes." Andrew R. Wheeler, Envtl. Prot. Agency, Reaffirmation of the U.S. Environmental Protection Agency's Indian Policy 1 (2019). The policy states that the "EPA works with tribes on a government-to-government basis to protect their land, air, and water." *Id.*

76.     The EPA has also developed specific consultation policies which require the EPA "to consult on a government-to-government basis with federally recognized tribal governments when EPA actions and decisions may affect tribal interests." U.S. Envtl. Prot. Agency, EPA Policy on Consultation and Coordination with Indian Tribes 1 (2011). The EPA describes consultation as "a process of meaningful communication and coordination between the EPA and tribal officials prior to the EPA taking actions or implementing decisions that may affect tribes." *Id.*

77.     The EPA policy requires four phases in the consultation process: "Identification, Notification, Input, and Follow-up." *Id.* at 4–5.

78.     The Identification Phase requires the EPA to identify "activities that *may be* appropriate for consultation" and the policy lists a number of avenues to ensure such activities are properly identified, including regular meetings with tribal partnership groups, analysis by tribal consultation advisors located in regional and national offices, and initiating an Action Development Process ("ADP") as early as possible to ensure the results of the ADP are available to affected tribes. *Id.* at 4, 6 (emphasis in original).

79.     The Notification Phase requires the EPA to "notif[y] the tribes of activities that may be appropriate for consultation." *Id.* at 4. This notification entails direct communication with tribes and "includes sufficient information for tribal officials to make an informed decision about the desire to continue with consultation and sufficient information to understand how to provide informed input." *Id.*

80.     During the Input Phase, the "EPA coordinates with tribal officials . . . to be responsive to their needs for information and to provide opportunities to provide, receive, and discuss input." *Id.* at 5. As "new issues arise," the EPA "may need to undertake subsequent rounds of consultation." *Id.*

81.     During the Follow-up Phase, the EPA should "provide[] feedback to the tribe(s) involved in the consultation to explain how their input was considered in the final action." *Id.* The feedback "should be a formal, written communication from a senior EPA official involved to the most senior tribal official involved in the consultation." *Id.*

82.     The EPA has also established an environmental policy for working with Native American tribes "to better clarify and integrate environmental justice principles in a consistent manner in the Agency's work with federally recognized tribes." U.S. Envtl. Prot. Agency, EPA

Policy on Environmental Justice for Working with Federally-Recognized Tribes and Indigenous Peoples 1 (2011). The policy states that "[t]he EPA consults with federally recognized tribes and provides meaningful involvement opportunities for indigenous peoples . . . and considers the potential impact of Agency actions that may affect their human health or environmental interests." *Id.* at 2.

83.     In the policy, "meaningful involvement" is defined as: "(1) potentially affected community members have an appropriate opportunity to participate in decisions about a proposed activity that will affect their human health or environment; (2) the public's input can influence the regulatory agency's decision; (3) the concerns of all participants involved will be considered in the decision-making process; and (4) the decision-makers seek out and facilitate the involvement of those potentially affected." *Id.* at 5.

84.     This trust responsibility also extends to the Corps in the exercise of its CWA responsibilities. *Nw. Sea Farms*, 931 F. Supp. at 1519–20 (finding that the fiduciary duty extends to the Corps in permitting duties) (citing *Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504, 1523 (W.D. Wash. 1988)).

85.     The Corps similarly states in its Tribal Consultation Policy that "[t]he trust responsibility will be honored and fulfilled" and that the Corps "will ensure that it addresses Tribal concerns regarding protected tribal resources, tribal rights (including treaty rights) and Indian lands." U.S. Army Corps of Eng'rs, Tribal Consultation Policy in the Regulatory Program and Related Documents, USACE Tribal Nations Community of Practice 2, 3 (2016); U.S. Army Corps of Eng'rs, Tribal Consultation Policy and Related Documents, USACE Tribal Nations Community of Practice 2, 3 (2013).

19

86.     The federal trust duty alters the standard deference afforded to federal lawmaking. *Montana v. Blackfeet Tribe,* 471 U.S. 759, 766 (1985) ("the standard principles of statutory construction do not have their usual force in cases involving Indian law."); *Oneida Cnty. v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985) ("[t]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians.").

87.     The Tenth Circuit has also held the trust duty and the Indian law canons of construction to be extended to executive agency actions. *HRI*, 198 F.3d at 1245 ("Considering this duty . . . we conclude that it is reasonable for EPA to adopt an interpretation of its regulations requiring, when lands are in dispute, presumptions in favor of Indian country status and resulting federal jurisdiction."); *see also United States v. Creek Nation*, 295 U.S. 103, 109–10 (1935) (holding that the federal executive is held to a strict fiduciary standard in relations with Indian tribes and is to take "all appropriate measures for protecting and advancing" those tribes' interests).

88.     The canons of construction regarding federal Indian law apply even when an executive official is implementing a statute of general applicability. *HRI*, 198 F.3d at 1246–47 (stating that an EPA decision "made within the framework of administering the [Safe Drinking Water Act], implicates the core federal trust responsibilities of administering—and safeguarding—Indian lands."). In reaching its holding, the Tenth Circuit relied on Felix Cohen's articulation of this trust responsibility as it applies to executive agencies:

> [T]he federal trust responsibility imposes strict fiduciary standards on the conduct of executive agencies—unless, of course, Congress has expressly authorized a deviation from these standards in exercise of its "plenary" power. Since the trust obligations are binding on the United States, these standards of conduct would seem

20

> to govern all executive departments that may deal with Indians, not just those such as the Bureau of Indian Affairs which have special statutory responsibilities for Indian affairs. Moreover, in some contexts the fiduciary obligations of the United States mandate that special regard be given to the procedural rights of Indians by federal administrative agencies.

*Id*. at 1245 (quoting Cohen, Handbook at 225). The federal trust responsibility has been expressly acknowledged by the EPA. *See* U.S. Envtl. Prot. Agency, EPA Policy on Environmental Justice for Working with Federally-Recognized Tribes and Indigenous Peoples 4 (2011) ("The EPA … acknowledges the federal government's trust responsibility to federally recognized tribes, based on the U.S. Constitution, treaties, statutes, executive orders, and court decisions.").

### B. The Administrative Procedure Act

89. The APA establishes requirements for federal agency decision making, including the agency rulemaking process. Final agency actions, including final rules, are subject to judicial review if there is no otherwise adequate remedy in a court. 5 U.S.C. § 704.

90. An agency must publish a notice of a proposed rulemaking in the Federal Register and provide an opportunity for public participation through the submission of comments or other information. 5 U.S.C. § 553(b)–(c).

91. A rule is unlawful and must be set aside when an agency acts in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, . . . or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (C), (D).

92. As detailed in *Motor Vehicle Manufacturers Ass'n. v. State Farm Mutual Auto. Insurance Co.*, 463 U.S. 29, 43 (1983), a rule is arbitrary and capricious if "the agency has relied

on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

93.    When an agency changes or reverses a prior rule, it must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005)); *Renewable Fuels Ass'n v. EPA*, 948 F.3d 1206, 1255 (10th Cir. 2020).

94.    While an agency need not show that a new rule is "better" than the rule it replaced, it must demonstrate that there are good reasons for the change in policy and that the change is permissible under the statute. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

95.    Furthermore, when an agency's new policy contradicts a previous policy, the agency must provide a more detailed justification for that change in position when "its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Id.* (internal citation omitted).

96.    Any "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Brand X*, 545 U.S. at 981.

**C. Environmental Justice**

97.     In 1994, President Bill Clinton signed Executive Order 12,898, Federal Actions to

Address Environmental Justice in Minority Populations and Low-Income Populations. 59 Fed.

Reg. 7629 (Feb. 16, 1994). As amended in 2021 by President Biden, Executive Order 12,898

remains in force today. *See* Exec. Order No. 14,008, 86 Fed. Reg. 7619, 7629–32 (Jan. 27,

2021).

98.     Executive Order 12,898 requires that each federal agency "shall make achieving

environmental justice part of its mission by identifying and addressing, as appropriate,

disproportionately high and adverse human health or environmental effects of its programs,

policies, and activities on minority populations and low-income populations." 59 Fed. Reg. 7629.

By its terms, Executive Order 12,898 also applies expressly to Indian tribes such as the Pueblo of

Laguna and Pueblo of Jemez. § 6-606 ("Each Federal agency responsibility set forth under this

order shall apply equally to Native American programs.").

99.     Since 1994, in order to ensure compliance with Executive Order 12,898,

administrative and judicial courts have required agencies to conduct an environmental justice

analysis. For example, in one citizen challenge to proposed oil drilling in the Arctic Ocean, the

EPA Environmental Appeals Board ("EAB") remanded permits under the CWA, directing the

EPA "to reconsider the adequacy of its environmental justice analysis." *In re Shell Offshore,

Inc.*, 15 E.A.D. 103, 157 (EAB 2010). In a citizen challenge to an airport runway expansion near

Boston, the D.C. Circuit concluded that the "environmental justice analysis in [FFA's] [National

Environmental Policy Act] evaluation [was] properly subject to 'arbitrary and capricious' review

under the APA." *Cmtys. Against Runway Expansion, Inc., v. FAA*, 355 F.3d 678, 689 (D.C. Cir.

2004). In a challenge by the Standing Rock Sioux Tribe to construction of the Dakota Access Pipeline, the district court agreed with the Tribe that the Corps failed to adequately consider the environmental justice aspects of the project in question "and thus failed to take a hard look at its environmental consequences." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 140 (D.D.C. 2017). In a citizen challenge to construction of the Atlantic Coast Pipeline, the Fourth Circuit found that a state agency subject to federal oversight "fail[ed] to consider the disproportionate impact" of the project on a predominantly African-American community. *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 92 (4th Cir. 2020) (observing that "environmental justice is not just a box to be checked," the court vacated the state air permit and remanded for further proceedings).

100.    As the district court noted in *Standing Rock*, "[t]he purpose of an environmental justice analysis is to determine whether a project will have a disproportionately adverse effect on minority and low income populations." 255 F. Supp. 3d at 140 (internal citations omitted). As indicated in the cases cited above, administrative and judicial courts have required environmental justice analyses from federal agencies operating under different federal statutes, including the Clean Air Act, 42 U.S.C. § 7401 *et seq*., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. Under NEPA, for example, while agencies are not required to take "the course of action that best serves environmental justice," they are required "to take a 'hard look' at environmental justice issues." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 102 (D.D.C. 2017) (quoting *Sierra Club v. Fed. Energy Regul. Comm'n*, 867 F.3d 1357, 1368 (D.C. Cir. 2017)).

101.     In *Standing Rock*, the district court explained that "[t]he National Environmental Policy Act . . . has two aims: it 'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action,' and 'it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking [sic] process.'" 255 F. Supp. 3d at 112 (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)). In evaluating the impact a proposed action might have, an agency is to consider, along with other factors, "the degree to which the action 'may cause loss or destruction of significant . . . cultural[ ] or historical resources.'" 255 F. Supp. 3d at 123 (citing 40 C.F.R. § 1508.27).

102.     An assessment of the impact on cultural and historical resources should be considered a vital part of an environmental justice analysis. An agency, such as the EPA, should "recognize the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action." Council of Envtl. Quality, Executive Office of the President, *Environmental Justice Guidance Under the National Environmental Policy Act* (1997).

103.     The EPA's own guidance on environmental justice states that the "EPA should be particularly careful not to diminish tribal resources, including cultural and natural resources and treaty rights, without tribal concurrence and the EPA should ensure the protection of such resources from environmental harm." U.S. Envtl. Prot. Agency, *Final Guidance for Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analyses* (1998).

104.     Removing or limiting access to clean water for both Pueblos' populations directly threatens to diminish tribal resources and adversely impact their cultural practices.

105.    Both Pueblos use water from local sources, both on and off their reservations, for domestic, ceremonial, and cultural practices.

106.    The Agencies failed to recognize the interrelated cultural factors that amplify the environmental effects of narrowing the definition of "waters of the United States," leaving unprotected hundreds of miles of ephemeral streams and wetlands that are essential to domestic uses and ceremonial and cultural practices.

107.    The Agencies additionally failed to consider the adverse and disproportionate effects on the populations of the Pueblos by promulgating the 2019 Repeal Rule and the 2020 Navigable Waters Rule in direct violation of executive direction regarding environmental justice and their own stated policies on incorporating environmental justice concerns into the NEPA process.

108.    Loss of protection for waters used by the Pueblos for domestic, ceremonial, and cultural practices is a direct impact from the EPA's rulemaking, and the cultural importance of using water from ephemeral streams and wetlands greatly amplifies the effects of the Agencies' new rule.

109.    The EPA arbitrarily failed to conduct an environmental justice analysis, falsely— and illogically—asserting that one was not required "because there is no significant evidence of disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, and/or indigenous peoples, as specified in Executive Order 12,898." Revised Definition of "Waters of the United States," 84 Fed. Reg. 4154 (proposed Feb. 14, 2019) (to be codified at 33 C.F.R. pt. 328). Had the EPA conducted an environmental justice analysis to support the 2020 Navigable Waters Rule, the agency would have learned and

understood how the narrowed definition of "waters of the United States" disproportionately affects the Pueblos.

110.    "Environmental justice is not just a box to be checked," *Friends of Buckingham*, 947 F.3d at 92. Addressing the issue of environmental justice would have and should have informed the Agencies' decision-making before they disregarded concerns expressed previously on behalf of the Pueblos. In particular, in promulgating the 2020 Navigable Waters Rule, the Agencies ignored the oral and written comments of the Pueblos opposing the proposed rule that would narrow the scope of "Waters of the United States." *See infra* ¶¶ 173–78. Accordingly, the Agencies failed to meet their obligations under Executive Order 12,898 and subsequent case law for achieving the ends of environmental justice.

### D.  Clean Water Act

#### 1.  Legislative Intent and Structure of the Clean Water Act

111.    In 1972, Congress enacted the Federal Water Pollution Control Act, commonly referred to as the Clean Water Act, to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

112.    Congress intended the CWA to be an "all-encompassing program of water pollution regulation" that would remedy the prior "inadequate" legal framework that left water pollution control primarily to states. *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 319 n.10 (1981); S. Rep. No. 92-414 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 3669, 3674.

113.    To achieve that aim of an all-encompassing program, Congress incorporated into the statute "a broad, systemic view of the goal of maintaining and improving water quality . . . ." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985).

114.     Congress chose to apply the protections of the CWA broadly because it recognized that "[w]ater moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source." *Id.* at 133 (citing S. Rep. No. 92–414, *as reprinted in* 1972 U.S.C.C.A.N. at 3742).

115.     The CWA's "definition of 'navigable waters' as 'the waters of the United States' makes it clear that the term 'navigable' as used in the Act is of limited import." *Riverside Bayview*, 474 U.S. at 133.

116.     The CWA expanded federal jurisdiction over water quality beyond the "traditional navigable waters" that had been the subject of prior, much weaker legal protections. Although the key substantive provisions of the CWA continue to apply to "navigable waters," 33 U.S.C. §§ 1311(a), 1344(a), 1362(12), Congress defined the term in 1972 to more expansively mean "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

117.     Congress also included in the CWA another provision that made clear that the term "navigable waters" applied to "waters . . . other than those waters which are presently used, or are susceptible to use . . . as a means to transport interstate or foreign commerce . . . ." 33 U.S.C. § 1344(g)(1). This provision shows "that the Act's term 'navigable waters' includes something more than traditional navigable waters." *Rapanos*, 547 U.S. at 731.

118.     The Conference Report from the passage of the CWA makes clear that Congress intended a broad reach through this definition: "The conferees fully intend that the term 'navigable waters' be given the *broadest possible constitutional interpretation* unencumbered by agency determinations which have been made or may be made for administrative purposes." S. Rep. No. 92-1236, at 144 (1972) (Conf. Report), *as reprinted in* 1972 U.S.C.C.A.N. 3776, 3822

(emphasis added); *see also Hubenka*, 438 F.3d at 1033 (stating that the CWA was intended "to cover, as much as possible, all waters of the United States instead of just some.").

119.    The CWA effects its comprehensive scheme of controlling water pollution at its source by prohibiting the discharge of any pollution into the "waters of the United States" without a permit. *See* 33 U.S.C. §§ 1311, 1342.

120.    The CWA establishes two broad types of permitting programs.

121.    Section 402 establishes the NPDES permitting program, which is administered by the EPA for the discharge of pollutants from point sources. 33 U.S.C. § 1342.

122.    The CWA allows the EPA to delegate the operation of this program to states and tribes. 33 U.S.C. § 1344(g)(1); 33 U.S.C § 1342(b); 40 C.F.R. § 123.33(a)–(b). Most states have received authority to administer the NPDES permitting program in their jurisdictions. There are only a few states that do not have this authority. For those states, including New Mexico and the tribes within its borders, the EPA administers this program.

123.    The second major permitting program is the Section 404 program, which establishes a permit process for the discharge of dredge-and-fill materials into "waters of the United States," administered by the Corps. 33 U.S.C. § 1344. As with Section 402, the CWA allows the EPA to delegate certain parts of Section 404 operation to states and tribes. However, such delegations are rare. To date, the Corps administers the Section 404 program for all but three states and for all tribes.

124.    In addition, Section 303 of the CWA requires states to adopt water quality standards that meet EPA minimum guidelines, or, if states fail to adopt adequate standards, to have the EPA set standards for the state. 33 U.S.C. § 1311. Section 401 in turn prohibits a federal

agency from permitting or licensing a discharge into "waters of the United States" unless the state (or tribe) where the discharge originates issues a certification that the permit or license will comply with applicable water quality requirements under Section 303 or waives its right to do so. 33 U.S.C. § 1341.

125.    Other sections of the CWA establish minimum federal requirements for pollution controls that together establish a minimum level of nationwide pollution protection, including requirements for technology-based standards that must be incorporated into NPDES permits. *See* 33 U.S.C. §§ 301, 302, 304, 306, 307, 510(1); 33 U.S.C. §§ 1311, 1312, 1314, 1316, 1317, 1370(1).

### 2.    Treating Tribes in a Similar Manner as States Under the CWA

126.    Federally recognized eligible tribes may apply to the EPA for "treatment in a similar manner as a state" status to implement particular CWA regulatory programs. 33 U.S.C. § 1377.

127.    Tribes that receive TAS have the option to administer CWA regulatory programs that would otherwise be administered by the EPA, which include Section 303(c) water quality standards, Section 303(d) impaired water listing and total maximum daily loads programs, Section 401 water quality certification programs, Section 404 dredge-and-fill permitting, Section 402 NPDES programs, and Section 405 sewage sludge management programs. 40 C.F.R. §§ 123.32, 130.16, 131.8, 233.60, 501.23.

128.    Tribes are not required to obtain or apply for TAS status. Tribes that choose to apply must go through a rigorous application process, which includes providing information on

the tribe's substantial capacity and technical experience to administer and enforce CWA provisions. 40 C.F.R. §§ 123.32, 130.16, 131.8, 501.23.

129. Nationwide, at least 70 tribes have received TAS status to establish Section 303(c) water quality standards, administer Section 401 water quality certifications, or to administer both programs. No tribes have received TAS authority for Section 402 NPDES permitting, Section 404 dredge-and-fill permitting programs, or Section 303(d) impaired water listings and total maximum daily loads programs.

130. The Pueblo of Laguna was granted TAS status for Section 303(c) and 401 programs.

131. The Pueblo of Laguna and the Pueblo of Jemez have applied for and received federal Clean Water Act grants under Section 106 for administering water quality programs.

132. Despite the TAS designation, the Pueblo of Laguna and the Pueblo of Jemez rely heavily on the EPA and the Corps to implement the majority of CWA protections within and around their boundaries.

### 3. Prior Regulations and Case Law on "Waters of the United States"

133. Beginning with rulemakings in 1975, the Agencies have interpreted the "waters of the United States" to apply to "not only actually navigable waters but also tributaries of such waters, interstate waters and their tributaries, and non[-]navigable intrastate waters whose use or misuse could affect interstate commerce." *Riverside Bayview,* 474 U.S. at 124; Permits for Activities in Navigable or Ocean Waters, 40 Fed. Reg. 31,320 (July 25, 1975).

134. The Supreme Court has on several occasions issued decisions interpreting the permissible scope of "waters of the United States."

135.     In *Riverside Bayview*, a unanimous Court found that the Corps' assertion of CWA jurisdiction over wetlands adjacent to open waters was a permissible interpretation of "waters of the United States" given the language, policies, and history of the CWA. 474 U.S. at 139.

136.     In *International Paper Co. v. Ouellette*, 479 U.S. 481, 497 (1987), the Court found that the CWA preempted state common law where that law would require "standards of effluent control . . . incompatible with those established" by the CWA. The Court found field preemption in part because of Congress' intent to establish a "comprehensive" program that "applies to all point sources and virtually all bodies of water." *Id.* at 492.

137.     In *Solid Waste Agency of Northern Cook County. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 166 (2001) (hereinafter *SWANCC*), the Supreme Court held that ''isolated," non-navigable intrastate ponds used by migratory birds were not permissibly classified as "waters of the United States." The Court explained that in contrast to the isolated ponds at issue, the finding of jurisdiction over wetlands in *Riverside Bayview* was predicated on "the significant nexus between the wetlands and 'navigable waters." *SWANCC* at 167.

138.     In 2006, the Supreme Court considered the permissible interpretation of "waters of the United States" in a plurality decision in *Rapanos,* 547 U.S. at 715–16.

139.     Justice Scalia's plurality opinion found that CWA jurisdiction did not extend to the wetlands in question, relying on a dictionary definition of "waters" as modified by the word "the" to conclude that the term "the waters of the United States" could "confer[] jurisdiction only over relatively permanent bodies of water." *Id.* at 739.

140.      Justice Kennedy's concurrence in judgment supported a "significant nexus" test, finding CWA jurisdiction where the water or wetland "either alone or in combination with

similarly situated [wet]lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780. As such, the Supreme Court's ruling in *Rapanos* rendered both the "Scalia test" and Justice Kennedy's "significant nexus" test as valid for determining "waters of the United States."

141.    In response to *Rapanos*, the Corps and the EPA issued a guidance letter clarifying how they would address CWA jurisdiction in light of the Supreme Court's decision. Envtl. Prot. Agency & U.S. Dep't of Army, Revised Guidance on Clean Water Act Jurisdiction Following the Supreme Court Decision in *Rapanos v. U.S.* & *Carabell v. U.S.* (2008). In the guidance, the EPA and the Corps stated that they would assert jurisdiction over waters and wetlands in a manner "consistent with the *Rapanos* decision." *Id.* at 4.

142.    The Agencies' post-*Rapanos* Guidance Memo "identifies those waters over which the agencies will assert jurisdiction categorically and on a case-by-case basis, based on the reasoning of the *Rapanos* decision." *Id.* at 4. Accordingly, the Agencies determined that they would apply jurisdiction to "non-navigable tributaries that are not relatively permanent" and "certain adjacent wetlands" on a case-by-case basis by applying the significant nexus test. *Id.* at 8.

143.    The Agencies would "assess the flow characteristics and functions of the tributary itself and the functions performed by any wetlands adjacent to that tributary, to determine whether collectively they have a significant nexus with traditional navigable waters." *Id.* at 8.

144.    Prior to the Supreme Court's *Rapanos* decision, the Tenth Circuit followed a significant nexus test in *Hubenka.* 438 F.3d 1026, 1031, 1034 (citing *United States v. Rapanos*,

339 F.3d 447, 452) (6th Cir. 2003); *Headwaters Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001)).

145.    After *Rapanos* was decided by the Supreme Court, several federal appellate courts interpreted and applied Justice Kennedy's significant nexus test, alone or in unison, to determine whether waterbodies were under CWA jurisdiction. *See, e.g.*, *Gerke Excavating, Inc.*, 464 F.3d 723, 725 (the Seventh Circuit holding that the significant nexus test "must govern the further stages of [the] litigation. . . ."); *N. Cal. River Watch*, 496 F.3d 993, 999 (the Ninth Circuit holding that Justice Kennedy's concurrence "is the narrowest ground to which a majority of the Justices would assent if forced to choose in almost all cases."); *Robison*, 521 F.3d 1319, 1322 (the Eleventh Circuit affirming application of the significant nexus test) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977) (for the proposition that the courts must determine "which of the positions taken by the *Rapanos* Justices *concurring in the judgment* is the 'narrowest,' i.e., the least 'far reaching.'") (emphasis in original)).

#### 4.   2015 Clean Water Rule

146.    The Agencies promulgated the Clean Water Rule in 2015 to help regulated entities better understand the scope of "waters of the United States," protect the nation's public health and aquatic resources, and to provide predictability as to where the CWA regulatory programs would be implemented. 80 Fed. Reg. at 37,054.

147.    In the rule, the Agencies articulated a definition of "waters of the United States" based on the significant nexus test and the CWA's objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* at 37,056.

148.     The Agencies based their jurisdictional determination on an analysis of the best available peer-reviewed science to determine the "strength of . . . chemical, physical, and biological" connectivity between various waters and wetlands and navigable waters in order to demonstrate the "nexus" between such waters. *Id.* at 37,062.

149.     The EPA's Office of Research and Development prepared a comprehensive report that formed the technical basis for the 2015 Clean Water Rule, 80 Fed. Reg. at 37,057. Envtl. Prot. Agency, Connectivity of Streams and Wetlands To Downstream Waters: A Review and Synthesis of the Scientific Evidence, EPA/600/R-14/475F (2015) (hereinafter Science Report). *See* Envtl. Prot. Agency & U.S. Dep't of the Army, Technical Support Document for the Clean Water Rule: Definition of Waters of the United States (2015). The Science Report, which was subject to a "comprehensive technical review," synthesized approximately 1,200 peer-reviewed studies, papers, agency guidance and regulatory determination manuals, and federal and state reports that address the connectivity of aquatic resources and effects on downstream waters and reached major conclusions as to the significant nexus between waterbodies and navigable waters. 80 Fed. Reg. at 37,057, 37,062.

150.     The 2015 Clean Water Rule includes four waters as "jurisdictional by rule" including traditional navigable waters, interstate waters, territorial seas, and impoundments of jurisdictional waters in the definition of "waters of the United States." 80 Fed. Reg. at 37,058. The 2015 Clean Water Rule also identified two categories of waters that required case-by-case analysis and waters that were categorically excluded from the rule. *Id.*

151.     Based on the scientific analysis, the 2015 Clean Water Rule states that to meet the definition of "tributary" a water must both "flow, either directly or through another water, to a

traditional navigable water, interstate water, or the territorial seas" and possess a "bed and banks and an indicator of ordinary high-water mark." *Id.* at 37,076.

152.    Critically, as long as these criteria were met, the Agencies determined that the flow in a tributary could be "perennial, intermittent, or ephemeral," as the science showed that all of these types of tributaries "are very effective at transporting pollutants downstream." *Id.*

### 5. 2019 Repeal Rule

153.    On February 28, 2017, President Trump issued Executive Order 13,778, which directed the Agencies to "repeal the 2015 Clean Water Act and promulgate a rule interpreting the term 'navigable waters' in a 'manner consistent with the opinion of Justice Antonin Scalia in *Rapanos*.'" Exec. Order No. 13,778, 82 Fed. Reg. 12,497.

154.    On July 27, 2017, the Agencies proposed to repeal the 2015 Clean Water Rule and revert to and recodify the previous regulation and guidance. Definition of "Waters of the United States"-Recodification of Pre-Existing Rules, 82 Fed. Reg. 34,903 (July 27, 2017).

155.    On October 22, 2019, the Agencies published the 2019 Repeal Rule which rescinded the 2015 Clean Water Rule and readopted the prior regulations dating back to 1986. 84 Fed. Reg. 56,626. The Agencies stated that they were repealing the 2015 Clean Water Rule in large part because the rule "misapplied and inappropriately expanded the significant nexus standard." *Id.* at 56,640.

156.    In adopting the 2019 Repeal Rule, the Agencies provided no explanation, analysis, discussion, or refutation of the Science Report or any of the other research and science in the administrative record that were relied on to establish which waters met the significant nexus test in the 2015 Clean Water Rule. Nor did the Agencies present any new science that

would support returning to the pre-2015 regulatory definition of "waters of the United States" under the significant nexus standard.

157.    In adopting the 2019 Repeal Rule, the Agencies failed to consider, evaluate, or analyze the effects of the repeal on Pueblos or their water resources.

### 6.  2020 Navigable Waters Rule

158.    The Agencies proposed the 2020 Navigable Waters Rule on February 14, 2019. 84 Fed. Reg. 4154. The Agencies promulgated the final rule on April 21, 2020. 85 Fed. Reg. 22,250.

159.    Pursuant to President Trump's Executive Order 13,778, the 2020 Navigable Waters Rule adopts a narrow definition of what waterbodies constitute "waters of the United States" that is "consistent with the opinion of Justice Antonin Scalia" in the *Rapanos* decision. 82 Fed. Reg. 12,497.

160.    The 2020 Navigable Waters Rule interprets "the waters" to "encompass relatively permanent flowing and standing waterbodies that are traditional navigable waters in their own right or that have a specific surface water connection to traditional navigable waters, as well as wetlands that abut or are otherwise inseparably bound up with such relatively permanent waters." 85 Fed. Reg. at 22,273.

161.    Despite making clear that the rule's interpretation of the "waters of the United States" is based on Justice Scalia's *Rapanos* opinion, the Agencies stated that their jurisdictional determinations give effect to some commonalities between the Scalia opinion and Justice Kennedy's concurrence. However, the Agencies did not rely on the significant nexus test articulated by Justice Kennedy to determine the jurisdictional status of different waters. *Id.*

162.    The Agencies consider "waters of the United States" under the 2020 Navigable Waters Rule to be "(1) [t]he territorial seas and traditional navigable waters; (2) tributaries of such waters; (3) certain lakes, ponds, and impoundments of jurisdictional waters; and (4) wetlands adjacent to other jurisdictional waters (other than waters that are themselves wetlands)." *Id.*

163.    The Agencies did not explain the rule's exclusion of some interstate waters and failed to consider the effects that ephemeral waters have on the physical, chemical, or biological integrity of downstream waters.

164.    Under the 2020 Navigable Waters rule, waters that do not fall into its jurisdictional categories will not be considered "waters of the United States" regardless of the waterway's significant nexus to traditionally navigable waters or other jurisdictional waters.

165.    These narrow categories are limited further by their corresponding definitions. For example, a tributary, as defined by the 2020 Navigable Waters Rule, must be "perennial or intermittent in a typical year." *Id.* at 22,339. This definition of tributary eliminates ephemeral streams from federal CWA jurisdiction, which the Agencies made explicit in their Final Rule: "[T]he final rule specifically clarifies that waters of the United States do not include . . . ephemeral features that flow only in direct response to precipitation, including ephemeral streams, swales, gullies, rills, and pools . . . ." *Id.* at 22,251.

166.    The Agencies failed to address or consider the findings of the Science Report regarding the connectivity and effect of tributaries on downstream waters.

167.    Preliminary feedback from the EPA's Science Advisory Board ("SAB") was provided to the Agencies on October 16, 2019 and reaffirmed that the Science Report utilized in

the 2015 Clean Water Rule was sound science, warranting respect as the best science available with regards to the connectivity of waterbodies. The SAB criticized the 2020 Navigable Waters Rule as "in conflict with established science, the existing ["waters of the United States"] rule developed based on established science and the objectives of the Clean Water Act." Envtl. Prot. Agency, Sci. Advisory Bd., Letter of the Science Advisory Board to EPA Administrator, Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act 1 (2019).

168.   EPA's SAB issued final comments on the proposed rule, concluding that it "decreases protection for our Nation's waters and does not provide a scientific basis in support of its consistency with the objective of restoring and maintaining 'the chemical, physical and biological integrity' of these waters." Envtl. Prot. Agency, Sci. Advisory Bd., Letter of the Science Advisory Board to EPA Administrator, Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act 2 (2020).

169.   The final SAB comments specifically criticized the rule for excluding ephemeral streams from CWA jurisdiction. "[T]he proposed definition of ["waters of the United States"] excludes ground water, *ephemeral streams*, and wetlands which connect to navigable waters below the surface. The proposed Rule does not present new science to support this definition, thus the SAB finds that the proposed Rule lacks a scientific justification, while potentially introducing new risks to human and environmental health." *Id.* at 4 (emphasis added).

170.   The Agencies finalized the 2020 Navigable Waters Rule before considering the final comments of the SAB.

171.    In response to the preliminary comments of the SAB, the Agencies acknowledged that only "certain aspects" of their jurisdictional determinations were "informed" by the Science Report. Instead, they posited that "[s]cience cannot dictate where to draw the line between Federal and State waters, as this is a legal question that must be answered based on the overall framework and construct of the CWA." 85 Fed. Reg. at 22,261.

172.    Pueblo of Laguna staff made oral comments on the proposed 2020 Navigable Waters Rule at the Tribal Co-Regulators Forum in Albuquerque, New Mexico, on March 27, 2019.

173.    The Pueblo of Laguna provided written comments regarding the proposed 2020 Navigable Waters Rule. Pueblo of Laguna, Comment Letter on Proposed Revised Definition of "Waters of the United States," Comment ID: EPA-HQ-OW-2018-0149-4799 (Apr. 14, 2019).

174.    In its comments, the Pueblo of Laguna emphasized that the proposed 2020 Navigable Waters Rule posed an imminent threat to tribes, failed to honor trust obligations, and would result in sources of water no longer being considered or protected by the CWA. The Pueblo of Laguna went on to comment that the rule would create significant gaps of protection from pollution in their surface water that would result in pollution that will generate consequences for generations to come. *Id.*

175.    The Pueblo of Jemez also submitted written comments on the proposed 2020 Navigable Waters Rule. Pueblo of Jemez, Comment Letter on Proposed Revised Definition of "Waters of the United States," Comment ID: EPA-HQ-OW-2018-0149-4565 (Apr. 15, 2019).

176.    In its comments, the Pueblo of Jemez warned that the proposed 2020 Navigable Waters Rule did not adequately consider the complexity of the drainage system in the arid

southwest. The proposed rule would exclude Pueblo of Jemez waters from protection under the CWA, and also much of the surface water in the Southwest. The Pueblo of Jemez commented that it lacks the resources to fill the gap created by the proposed 2020 Navigable Waters Rule. *Id.*

177.    In addition, on April 19, 2019, the All Pueblo Council of Governors ("APCG"), of which the Pueblo of Jemez and Pueblo of Laguna are members, provided written comments on the proposed 2020 Navigable Waters Rule. All Pueblo Council of Governors, Comment Letter on Proposed Revised Definition of "Waters of the United States," Comment ID: EPA-HQ-OW-2018-0149-5107 (Apr. 15, 2019).

178.    In its comments, the APCG warned that the proposed 2020 Navigable Waters Rule weakens CWA protections for tribal waters and poses an imminent threat to tribal communities. The APCG went on to comment that the proposed 2020 Navigable Waters Rule created enforcement gaps and failed to protect tribal lands under the CWA, which would result in pollution and negative consequences for Pueblo generations to come. *Id.*

### E.  The 2019 Repeal Rule and 2020 Navigable Waters Rule Harm the Pueblo of Laguna and the Pueblo of Jemez

179.    The 2019 Repeal Rule and 2020 Navigable Waters Rule harm the sovereign, governmental, environmental, economic, and proprietary interests of the Pueblos.

#### 1.  Tribal Water Resources Will No Longer be Protected from Pollution by Federal Standards, and Tribal Governments will not Have the Capacity to Provide the Same Level of Protection

180.    The Pueblo of Laguna is located downstream of the City of Grants, the Roca Honda, L-Bar, Homestake, Rio Grande Resources Mount Taylor mine, and Bluewater uranium mines, and the Lee Ranch Coal Mine. Pollution discharged by upstream entities pollutes multiple waterbodies on the Pueblo of Laguna.

181.     The Pueblo of Jemez is located downstream of the Village of Jemez Springs,
Cañon, Ponderosa, Soda Dam, pumice mines, and thousands of dispersed recreational camp
sites. The South Pit Pumice Mine, within the Jemez watershed, is currently proposed for
expansion, posing an imminent and increasing threat to downstream water quality of the Pueblo.

182.     The 2019 Repeal Rule and the 2020 Navigable Waters Rule narrow the scope of
the CWA to waters that flow constantly and explicitly excludes ephemeral waters.

183.     Most of the waterways in the Pueblos are ephemeral, which means they lack
continuous surface flow of water.

184.     The Pueblos use ephemeral waters for domestic, agricultural, cultural, and
religious purposes.

185.     The Pueblos rely on the protections of the CWA, including federal enforcement of
CWA standards and technical assistance, to protect their water resources, including ephemeral
waters. They also have relied on the "significant nexus" test and the 2015 Clean Water Rule's
jurisdictional determinations to protect these waters.

186.     The 2019 Repeal Rule and 2020 Navigable Waters Rule are harming and will
imminently harm the Pueblo of Laguna and the Pueblo of Jemez and their members because they
have stripped CWA protections from many waterbodies within the respective Pueblos, from
waterways upstream of the Pueblos' reservation borders, and from waterways that are on federal
lands to which the Pueblos' have ongoing and longstanding legal and cultural connections.
Hundreds of miles of ephemeral streams that support the Pueblos' agriculture, recreation, and
cultural and spiritual practice are now at imminent risk of degradation and destruction without
federal protection.

42

187.    The Pueblo of Laguna will be and already is subjected to actual harms because it is no longer able to exercise its CWA Section 401 right to certify certain upstream dischargers as meeting its Section 303 water quality standards for those waterbodies that are now stripped of their CWA jurisdiction. For example, the Pueblo of Laguna previously reviewed an upstream NPDES permit through its Section 401 TAS program.

188.    Both Pueblos will be and already are subjected to actual harms because they no longer can rely on the Agencies to enforce or provide technical assistance for the protection of waterbodies that are no longer jurisdictional. The Pueblo of Jemez relies on the EPA and the Corps to enforce and administer all water pollution protection programs on its lands. The Pueblo of Laguna relies on the EPA and the Corps to enforce and administer all water pollution programs on its lands except for the Section 303(c) and 401 programs for which it has TAS status. Even for these programs, it relies on federal technical assistance.

189.    Although the Agencies suggested that tribes and states now have the advantage of creating their own water pollution protection programs for non-jurisdictional waters, the Pueblos do not have the resources and technical capacity to take over fully the federal role in protecting water quality under the CWA, and the Agencies have acknowledged this contradiction. 85 Fed. Reg. at 22,336–37.

190.    To the extent that the Pueblos do attempt to create tribal water pollution control programs for non-jurisdictional waters, they will be economically harmed because they will need to expend scarce resources on these programs. The Pueblos have fewer resources than states to implement their own comprehensive water quality programs.

191.    Further, any Pueblo efforts to initiate tribal water pollution control programs for

non-jurisdictional waters will take significant time, during which the waters of both Pueblos will

be left unprotected and in jeopardy.

192.    These harms are directly traceable to the actions of the Agencies in promulgating

a narrower, unscientific definition of "waters of the United States," contrary to the purpose of the

CWA.

193.    The imminent and actual harms suffered by the Pueblos will be directly redressed

by a decision from this court to set aside and vacate the 2019 Repeal Rule and the 2020

Navigable Waters Rule.

> **2.  The Agencies' Failure to Meaningfully Consult with the Pueblos
> Regarding Concerns with the 2019 Repeal Rule and the 2020 Navigable
> Waters Rule is a Violation of the Federal Trust Duty and Adversely
> Impacts Tribal Sovereignty**

194.    The Pueblos are federally recognized tribes. 86 Fed. Reg. at 7556.

195.    In recognition of the trust duty, federal government policy—as stated by

Executive Order and internal agency policy—is to engage in meaningful government-to-

government consultation prior to taking significant actions that may affect tribal interests. *See*

U.S. Envtl. Prot. Agency, EPA Policy on Consultation and Coordination with Indian Tribes 1

(2011); Wheeler, Reaffirmation of the U.S. Environmental Protection Agency's Indian Policy 1;

U.S. Army Corps of Eng'rs, Tribal Consultation Policy and Related Documents, USACE Tribal

Nations Community of Practice; Exec. Order No. 13,175, 65 Fed. Reg. 67,249.

196.    The Agencies failed to follow their tribal consultation policies requiring regular

and meaningful government-to-government communication and coordination. Rather, tribes

were offered listening sessions, where EPA gave Tribes' the opportunity to express concerns

about the rollback of protected waters. These listening sessions did not allow for any response or dialogue from the EPA, nor did the EPA provide a consolidated version of the comments provided at these sessions to the tribes afterwards.

197.    The EPA failed to "seek out and facilitate" meaningful involvement from tribal leaders. *See* U.S. Envtl. Prot. Agency, EPA Policy on Environmental Justice for Working with Federally-Recognized Tribes and Indigenous Peoples 5.

198.    The Agencies conducted no leader-to-leader meetings with the Pueblo of Jemez or the Pueblo of Laguna, either in person, or via telephone or video conferencing. *See* U.S. Envtl. Prot. Agency, Summary Report of Tribal Consultation and Engagement for the Navigable Waters Protection Rule 22–27.

199.    The EPA did not follow its own policy of providing feedback to senior tribal officials of either Pueblo explaining how their input was considered in the rulemaking. U.S. Envtl. Prot. Agency, EPA Policy on Consultation and Coordination with Indian Tribes 4, 6.

200.    Despite the Agencies' establishing tribal consultation policies for the purpose of respecting tribal sovereignty through government-to-government consultation, the Agencies have ignored the Pueblos' concerns about the 2019 Proposed Rule and 2020 Navigable Waters Rule. *Id.*

201.    Contrary to their tribal consultation policies, the Agencies actually undermined tribal sovereignty by failing to consider the economic and administrative impact on the Pueblos' implementation of water resource protections, disregarding the reality that "many Tribes may lack the capacity to create a tribal water program under tribal law, to administer a program, or to

expand programs . . . ." Instead, the Agencies relied on the flimsy assertion that the rule

"preserves tribal authority." 85 Fed. Reg. at 22,336–37.

202.    The Agencies promulgated the 2019 Repeal Rule and the 2020 Navigable Waters

Rule without due respect for Pueblo sovereignty by undermining the Pueblos' ability to protect

waters within their boundaries and to gain enforcement of water standards on upstream users.

The Agencies failed to consult with the Pueblos on a government-to-government basis and in

accordance with their own policies and failed to address the gap in protection that the 2019 and

2020 rules create. By only providing generalized presentations and "listening sessions" but no

direct consultation, the Agencies further undermined the Pueblos' sovereignty by failing to

engage with or meaningfully consult tribal leadership, or provide feedback showing how they

took into account the Pueblos' comments and concerns in the final rulemaking.

### F.  Vacatur of a Current Rule

203.    The Administrative Procedure Act provides that the reviewing court shall set

aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law," or if the action failed to meet statutory, procedural, or constitutional

requirements. 5 U.S.C. § 706(2)(A), (B), (C), (D); *Citizens to Preserve Overton Park, Inc. v.*

*Volpe*, 401 U.S. 402, 413–14 (1971).

204.    Vacatur is "the presumptively appropriate remedy for a violation of the APA."

*Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) (citing *Fed. Commc'ns*

*Comm'n v. Nextwave Personal Commc'ns, Inc.*, 573 U.S. 293, 300 (2003)). *See also Nat'l*

*Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("We have

made clear that 'when a reviewing court determines that the agency regulations are unlawful, the

ordinary result is that the rules are vacated . . . .'") (quoting *Harmon v. Thornburgh*, 878 F.2d

484, 495 n.21 (D.C. Cir. 1989)).

205.    The Tenth Circuit has held that when an agency action is arbitrary and capricious,

vacatur "is a common, and often appropriate form of injunctive relief granted by district courts."

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1239 (10th Cir. 2017).

206.    This Court also holds that "vacatur is the normal and presumed remedy" for

violations of the Administrative Procedure Act. *N.M. Farm & Livestock Bureau v. U.S. Dep't of

Interior*, No. 15-428, slip. op., 2021 WL 275535 at *8 (D.N.M. Jan. 27, 2021).

207.    Because vacatur is the normal remedy, a court is only permitted "to remand

without vacating the agency's action in limited circumstances." *Id.* at * 5 (citing *Am. Great

Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020)).

208.    The party seeking remand without vacatur carries the burden of overcoming a

presumption of vacatur. *Id.* (citing *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d

1105, 1121–22 (9th Cir. 2018)).

209.    In determining whether to allow unlawful agency action to stand pending agency

action on remand, this Court assesses "'the seriousness of the [agency action's] deficiencies (and

thus the extent of doubt whether the agency chose correctly'" with "'the disruptive consequences

of an interim change that may itself be changed.'" *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear

Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (establishing the *Allied-Signal* test)).

210.    This Court has recently applied the *Allied-Signal* test to determine that vacatur

was the appropriate remedy for APA violations in a variety of cases. *See, e.g.*, *N.M. Farm &

Livestock Bureau*, No. 15-428, 2021 WL 275535 (employing the *Allied-Signal* test to vacate

unlawful critical habitat reduction); *N. N.M. Stockman's Ass'n v. U.S. Fish and Wildlife Serv.*, No. 18-1138, 2020 WL 6048149 (D.N.M. Oct. 13, 2020) (same); *N.M. Health Connections v. U.S. Dep't of Health and Human Serv.*, 340 F. Supp. 3d 1112 (D.N.M. 2018) (applying the *Allied-Signal* test to vacate an agency action based on erroneous assumptions).

211.     Balancing the equities under the *Allied-Signal* test strongly favors remand with vacatur. The seriousness of the agency's deficiencies in the promulgation of the 2020 Navigable Waters Rule, the potential prejudice to the Pueblos if the rule were to remain in effect on remand, and the purpose of the substantive statute far outweigh any potential consequences of invalidating the agency rule. The removal of federal jurisdiction over the vast majority of the Pueblos' waters leaves them with little ability to adequately protect their waters against upstream polluters, threatening adverse effects on the health and welfare of their members.

212.     The Agencies' deficiencies in promulgating the 2020 Navigable Waters Rule were significant, serious, and substantive. The rule is an impermissible interpretation of "waters of the United States" as it fails to protect those waters as required by the CWA and the Supreme Court. By narrowing the definition of "waters of the United States" to exclude waters having an effect on or connection to the integrity of downstream, traditionally navigable waters, the Agencies have violated the statutory mandate.

213.     Courts regularly decline to exercise their discretion to order remand without vacatur "when an agency has committed substantive errors, as opposed to procedural ones." *Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 344 F. Supp. 3d 355, 378 (D.D.C. 2018). In addition to the Agencies' substantive errors, the Agencies also engaged in a variety of procedural errors by promulgating a rule that was arbitrary, capricious, and an abuse of discretion because it was

not adequately supported by the record; by failing to meaningfully consider and address the Pueblos' comments; and by violating their trust responsibility to the Pueblos.

214.    This Court has adopted additional equitable factors aiding its *Allied-Signal* analysis to determine if such limited circumstances exist to remand without vacatur. *Id.* (citing *Coal. of Arizona/New Mexico Cntys. for Stable Econ. Growth v. Salazar*, No. 07-CV-00876, 2009 WL 8691098 at *3 (D.N.M. May 4, 2009)) (including "(1) the purpose of the substantive statute . . . ; (2) the consequences of invalidating or enjoining the agency action; (3) potential prejudice to those who will be affected by maintaining the status quo; and (4) the magnitude of the [alleged] administrative error and how extensive and substantive it was.").

215.    In *N.M. Health Connections*, after employing the equitable factors in the *Allied-Signal* test, this Court listed other scenarios in which vacatur is appropriate, including "where 'such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand . . . .'" 340 F. Supp 3d at 1178 (quoting *Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015)); as well as "where the agency's reasoning behind a rule is 'flimsy and [] half-hearted . . . .'" *Id.* (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1053 (D.C. Cir. 2002)).

216.    The Agencies' promulgation of the 2020 Navigable Waters Rule was fundamentally flawed, arbitrary and capricious, and it is unlikely that it would be adopted on remand; the Agencies' reasoning that the Rule supports or advances tribal sovereignty by removing federal protection is flimsy and half-hearted. The Pueblos rely on federal protection for clean water; removing that protection for the overwhelming majority of the Pueblos' waters

endangers them with uncontrolled pollution, threatening adverse effects on the physical, economic, and spiritual health and welfare of the communities.

217.    The consequences of vacatur would not be disruptive, as the 2020 Rule itself is already disruptive to the purpose of the CWA; reinstating jurisdiction over non-navigable waters would not strain the Agencies' resources or expertise, as they have provided support and protection to tribes and their waters before. *Compare N. N.M. Stockman's Ass'n*, No. 18-1138 at *443 (noting the disruptive consequences posed to the U.S. Fish and Wildlife Service and the endangered Jumping Mouse outweigh the agency's deficiencies in promulgating the mouse's critical habitat designation), *with N.M. Health Connections*, 340 F. Supp. 3d at 1182 (despite alleged economic burdens, not finding sufficient disruption to outweigh vacatur), *and N.M. Cattle Growers Ass'n v. Norton*, No. 02-0461, 2003 U.S. Dist. LEXIS 18534 at *8–9 (D.N.M. Sept. 30, 2003) (same, and noting "'there must be some factual basis for determining what the disruptive consequences might be'" (quoting *Bldg. Indus. Legal Def. Found. v. Norton*, 231 F. Supp. 2d 100, 106 (D.D.C. 2002)).

218.    The potential prejudice to the Pueblos, if the status quo were to be maintained on remand, is immense. While the Agencies could take months or years to reconsider their rule, the Pueblos would be forced to regulate waters in a similar manner to the Agencies, but with little of the funding, staffing, enforcement power, and expertise afforded to the EPA and the Corps.

219.    Applying the *Allied-Signal* test, as this Court has done, to the promulgation of the 2020 Navigable Waters Rule, the Agencies' deficiencies in the promulgation of the rule and the potential prejudice to the Pueblos far outweigh the potential disruptive consequences resulting from vacatur. Vacatur of the 2020 Navigable Waters Rule is therefore an appropriate remedy.

## V.   CAUSES OF ACTION

### CLAIM 1: THE 2020 NAVIGABLE WATERS RULE IS AN IMPERMISSIBLE INTERPRETATION OF "WATERS OF THE UNITED STATES" UNDER THE CWA AND JUDICIAL PRECEDENT

(2020 Navigable Waters Rule - Violation of the Administrative Procedure Act, 5 U.S.C. § 706 and Clean Water Act, 33 U.S.C. § 1251 *et seq.*)

220.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

221.    A rule is unlawful and must be set aside by the court when an agency acts in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, . . . or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (C), (D).

222.     The purpose of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

223.    CWA jurisdiction is limited to "navigable waters," defined as "waters of the United States."

224.    The 2020 Navigable Waters Rule is contrary to law as it fails to protect the "waters of the United States" as required by the CWA and the judgments of the Supreme Court and the Circuit Courts of Appeals by narrowing the definition of "waters of the United States" to exclude multiple waters that can affect the physical, chemical, and biological integrity of downstream traditional navigable waters.

225.    The Agencies exceeded their authority and acted contrary to the CWA by adopting provisions in the 2020 Navigable Waters Rule that unlawfully defined waters of the U.S. to exclude waters having an effect on or connection to the physical, chemical, and biological integrity of downstream, traditional navigable waters, including by: (A) defining

"tributaries" to exclude ephemeral waters; and (B) by excluding waters that lack a surface

connection to traditional navigable waters in a "typical year," but that have an effect on or

connection to downstream traditional navigable waters. 85 Fed. Reg. at 22,251; see 33 U.S.C. §

1251 *et seq.* As a result, the Agencies' promulgation of the 2019 Repeal Rule and the 2020

Navigable Waters Rule was not in accordance with the law and short of statutory right.

### CLAIM 2: THE 2019 REPEAL RULE AND THE 2020 NAVIGABLE WATERS RULE ARE ARBITRARY AND CAPRICIOUS AND AN ABUSE OF DISCRETION BECAUSE THE FINAL RULE IS NOT ADEQUATELY SUPPORTED BY THE RECORD

(2019 Repeal Rule and 2020 Navigable Waters Rule - Violation of the Administrative Procedure Act, 5 U.S.C. § 706)

226.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

227.    A rule is unlawful and must be set aside when an agency acts in a manner that is

"arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

228.    An agency must demonstrate good reasons for any changes in policy and must

show the change is permissible under the governing statute. *FCC v. Fox Television Stations, Inc.*,

556 U.S. at 515.

229.    An agency rule contradicting previous policy must include a more detailed

justification than rules of first interpretation, when "its new policy rests upon factual findings

that contradict those which underlay its prior policy, . . . or when its prior policy has engendered

serious reliance interests that must be taken into account." *Id.* (internal citation omitted).

230.    An unexplained inconsistency in agency policy is "a reason for holding an

interpretation to be an arbitrary and capricious change from agency practice under the

[APA]." *Brand X*, 545 U.S. at 981.

231.     A rule is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

232.     First, the 2019 Repeal Rule and the 2020 Navigable Waters Rule are arbitrary and capricious and an abuse of discretion because they fail to offer a detailed explanation for why they contradict or ignore the scientific factual findings underlying the 2015 Clean Water Rule, and instead reverse course after decades of EPA and Corps practice and judicial decisions supporting federal CWA protections for many types of waters, including ephemeral streams.

233.     The 2020 Navigable Waters Rule does not attempt to assess, consider, or explain the effects on this narrowing of jurisdiction, either by characterizing the extent to which waters will lose protections or how this loss of protections may impact their physical, chemical, or biological integrity. Instead, the Agencies claim that they are unable to quantify the changes without any further explanation. 85 Fed. Reg. at 22,332.

234.     The Agencies do not offer any detailed refutation or discussion of the findings of the Science Report that served as the basis for the significant nexus determinations in the 2015 Clean Water Rule, stating only that the 2020 Navigable Waters Rule was "informed" by science in "certain aspects." *Id.* at 22,288.

235.     The Agencies fail to provide any support for their assertion that the 2020 Navigable Waters Rule strikes a "better balance" between the objective of the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. §

1251(a), and the statute's policy "to recognize, preserve, and protect the primary responsibilities and rights of States." 85 Fed. Reg. at 22,261.

236.     The Agencies' promulgation of the 2020 Navigable Waters Rule also was arbitrary, capricious, and an abuse of discretion because it did not acknowledge, assess, or consider how this reversal of policy would harm the Pueblos' longstanding reliance on federal CWA protections of their waterbodies. The Agencies failed to consider the economic and administrative impact on the Pueblos' implementation of water resource protections, disregarded the reality that "many Tribes may lack the capacity to create a tribal water program under tribal law, to administer a program, or to expand programs . . . . ," and instead relied on the flimsy assertion that the rule "preserves tribal authority." *Id.* at 22,336–37.

237.     Finally, the promulgations of the 2019 Repeal Rule and the 2020 Navigable Waters Rule were arbitrary, capricious, and an abuse of discretion because they failed to abide by executive branch policies with regards to environmental justice, including with regards to tribes.

238.     The Agencies failed to abide by Presidential Executive Order 12,898, which requires agencies to identify and address, "as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations." 59 Fed. Reg. 7629.

239.     Despite input that the Agencies received from the Pueblos and other tribes, the Agencies arbitrarily and capriciously dismissed environmental justice impacts in the final 2020 Navigable Waters Rule, stating without support that the rule was "not subject to Executive Order 12,898 . . . because there is no significant evidence of disproportionately high and adverse

human health or environmental effects on minority populations, low-income populations, and/or indigenous peoples." 85 Fed. Reg. at 22,337. The Agencies claimed to find "no significant evidence" of disproportionate impacts even though they failed entirely to conduct an environmental justice analysis that may have identified such disproportionate impacts, in violation of Executive Order 12,898 and subsequent case law.

240.     The Agencies arbitrarily ignored their own environmental justice policies, which among other things, require the EPA to use "legal authorities . . . to advance environmental justice goals in its work . . . in Indian country." U.S. Envtl. Prot. Agency, Policy on Environmental Justice for Working with Federally-Recognized Tribes and Indigenous Peoples 2.

241.     The Agencies failed to adequately demonstrate good reasons for the changes in policy effectuated by the new rulemaking. They further failed to adequately assess the detrimental impacts of the rulemaking considering the Pueblos' reliance on federal protections and failed to assess the disproportionately high and adverse human health and environmental effects of the rulemaking on tribes and Indigenous peoples. Therefore, the 2019 Repeal Rule and the 2020 Navigable Waters Rule are arbitrary, capricious, and an abuse of discretion.

### CLAIM 3: THE 2020 NAVIGABLE WATERS RULE IS ARBITRARY AND CAPRICIOUS AND AN ABUSE OF DISCRETION BECAUSE THE AGENCIES DID NOT MEANINGFULLY CONSIDER AND ADDRESS SIGNIFICANT COMMENTS OF PUEBLO PETITIONERS

(2020 Navigable Waters Rule - Violation of the Administrative Procedure Act, 5 U.S.C. § 706)

242.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

243.     Under the APA, in a notice-and-comment rulemaking, an agency "must respond in a reasoned manner to those [comments] that raise significant problems." *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 257 (D.C. Cir. 2003) (quoting *Reytblatt v. Nuclear Regul.*

*Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997)). The failure to respond to significant comments

demonstrates that an agency's decision was not based on a consideration of the relevant factors.

*Texas Mun. Power Agency v. Envtl. Prot. Agency*, 89 F.3d 858, 876 (D.C. Cir. 1996) (quoting

*Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984)).

244.    The Agencies here failed to consider the significant comments of the Pueblos.

245.    In particular, the Agencies failed to address how the Pueblos are supposed to fill

in gaps in enforcement created by the rule, how the rule satisfies the Agencies' trust

responsibility to the Pueblos, or proposals that the Agencies maintain broader federal CWA

jurisdiction for the Pueblos.

246.    The Agencies' promulgation of the 2019 Repeal Rule and 2020 Navigable Waters

Rule therefore impermissibly failed to consider relevant factors and is arbitrary and capricious

and an abuse of discretion.

### CLAIM 4: THE 2020 NAVIGABLE WATERS RULE IS ARBITRARY AND CAPRICIOUS BECAUSE IT IS A VIOLATION OF THE FEDERAL GOVERNMENT'S TRUST RESPONSIBILITY TO TRIBES

(2019 Repeal Rule and 2020 Navigable Waters Rule - Violation of Administrative Procedure
Act, 5 U.S.C. § 706, and the Agencies' trust responsibility)

247.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

248.    "The federal trust responsibility imposes strict fiduciary standards on the conduct

of executive agencies" when they act in relation to Indian tribes. *HRI, Inc.*, 198 F.3d at 1245

(quoting Cohen, Handbook at 225).

249.    First, the federal government's trust duty and the Agencies' own policies relating

to the trust duty require that the Agencies consider how their rulemakings impact tribal rights

and resources. *See Nw. Sea Farms*, 931 F. Supp. at 1519–20 (stating that the federal trust

obligation imposes a fiduciary duty on "any government action" relating to Indian tribes) (citing *Nance*, 645 F.2d at 711); *HRI, Inc.*, 198 F.3d at 1245.

250.    The Pueblos and other tribes warned the Agencies about the harmful effects of the rules on tribal water resources and the lack of tribal capacity to implement enforceable water standards to fill the jurisdictional gap created by the 2020 Navigable Waters Rule.

251.    Despite these comments, the Agencies failed to adequately analyze or consider how the rule would affect tribal water resources or whether the tribes would have the capacity to implement their own water pollution control programs.

252.    Instead, the Agencies summarily acknowledged that the 2020 Navigable Waters Rule "has tribal implications," but baldly stated that the rule "will neither impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law." 85 Fed. Reg. at 22,336.

253.    The Agencies offered no rationale for ignoring the Pueblos' concerns, nor did they identify any changes in the final rule that responded to these concerns. The Agencies merely justified their decision by stating that "the rule preserves tribal authority to choose whether or not to regulate waters that are not covered under the CWA." *Id.* at 22,337.

254.    However, the Agencies have admitted that "[w]hile some Tribes have established tribal water programs under tribal law or have the authority to establish tribal programs under tribal law, many Tribes may lack the capacity to create a tribal water program under tribal law, to administer a program, or to expand programs that currently exist. Other Tribes may rely on the Federal government for enforcement of water quality violations." *Id.* at 22,336–37.

255. Given this reliance by tribes on the protections of the CWA, the federal government has forgone its responsibilities to protect tribal resources and has violated its trust duty by promulgating the 2020 Navigable Waters Rule. *Id.* at 22,337.

256. The EPA's Economic Analysis similarly "[did] not consider how the 573 federally recognized tribes might react to a change in CWA jurisdiction, nor does it include tribes in its calculations of costs and benefits." U.S. Envtl. Prot. Agency, Economic Analysis for the Final Rule: "Waters of the United States"—Recodification of Pre-Existing Rules 44, Comment ID: EPA-HQ-OW-2018-0149-11690 (Sept. 5, 2019). Nor did the analysis "account for potential effects related to subsistence fishing, rice growing, or cultural uses of water that are unique to tribes and their reliance on waters that would no longer be considered jurisdictional under the final rule." *Id.* at 45.

257. The 2020 Navigable Waters Rule violates the long-standing trust responsibility to protect tribes and tribal resources. Additionally, the Agencies breached their trust responsibility by not considering how their actions would affect tribal resources. Therefore, the Agencies failed to consider an important aspect of the problem and their promulgation of the rule was arbitrary and capricious.

258. Second, federal agencies have a duty to engage in "an accountable process to ensure meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications." Exec. Order No. 13,175, 65 Fed. Reg. at 67,250.

259. Under executive branch policies relating to the trust duty, executive agencies have a duty to meaningfully consult with tribes, consider how agency actions affect tribal rights and resources, and respect tribal self-governance and sovereignty when taking actions that have tribal

implications. *Id.*; 74 Fed. Reg. 57,881 ("[E]xecutive departments and agencies are charged with engaging in regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications . . . ."); 86 Fed. Reg. 7491 (President Biden's recognition of the policy announced in Executive Order 13,175 and continued commitment to "honoring Tribal sovereignty and including Tribal voices in policy deliberation that affects Tribal communities").

260.    The Agencies failed to follow their tribal consultation policies requiring regular and meaningful government-to-government communication and coordination and therefore breached their duty to meaningfully consult with the Pueblos. Rather, tribes were offered listening sessions, where EPA gave tribes the opportunity to voice concerns about the rollback of protected waters. These listening sessions did not allow for any feedback from the EPA nor did the EPA provide a consolidated version of the comments provided at these sessions to the tribes afterwards.

261.    The Agencies never conducted any leader-to-leader meetings with the Pueblo of Jemez or Pueblo of Laguna. *See* U.S. Envtl. Prot. Agency, Summary Report of Tribal Consultation and Engagement for the Navigable Waters Protection Rule 13–14, 22–27. Instead of engaging in a government-to-government dialogue in the development of policy, the EPA offered generic "listening sessions" that did not allow any meaningful conversations.

262.    When agencies change or deviate from their existing policies, they must provide a reasoned explanation for doing so. *See Encino Motorcars, LLC*, 136 S. Ct. at 2125. While an agency's explanation in this regard is not held to a higher standard of review, the agency must "display awareness that it is changing position" and "show that there are good reasons for the

new policy." *Id.* at 2125–26 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. at 515).

Thus, an "[u]nexplained inconsistency" in agency policy is "a reason for holding an

interpretation to be an arbitrary and capricious change from agency practice." *Id.* (quoting *Brand

X*, 545 U.S. at 981).

263.    The 2020 Navigable Waters Rule is arbitrary and capricious because the Agencies

did not provide a reasoned explanation for why they failed to provide meaningful consultation,

including leader-to-leader meetings, with the Pueblos. This failure is a change in policy

inconsistent with internal agency policies regarding tribal trust responsibilities.

264.    Finally, the federal trust responsibility generally requires the government to avoid

taking actions that harm tribal resources, including waters that flow over and through tribal

lands, and the natural resources that depend on that water. *See, e.g.*, *Mitchell*, 463 U.S. at 225–

26; *Seminole Nation v. United States*, 316 U.S. 286, 296–97 (1942).

265.    The trust duty requires agencies and the courts to construe statutes liberally in

favor of tribes, resolving ambiguities in their favor. *See Montana*, 471 U.S. at 766; *HRI, Inc.*, 198

F.3d at 1245.

266.    The Agencies had discretion to apply a broader interpretation of "waters of the

United States" as they did in the 2015 Clean Water Rule, which would have avoided harm to the

Pueblos' waters. Instead, the Agencies' narrow interpretation of "waters of the United States" in

the 2020 Navigable Waters Rule withdraws federal water quality protections over Pueblo

streams that are ephemeral, intermittent, and seasonal, as well as groundwater, upon all of which

the Pueblos rely.

267.    Accordingly, the Agencies breached their trust duty to the Pueblos by failing to engage in meaningful government-to-government consultation, failing to analyze how the 2020 Navigable Water Rule would impact Pueblo rights and resources, and failing to protect tribal water resources. As a result, the 2019 Repeal Rule and 2020 Navigable Waters Rule are arbitrary, capricious, and otherwise not in accordance with law.

## VI.    REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court:

A. Declare that the Agencies acted arbitrarily and unlawfully in promulgating the challenged rules, Definition of 'Waters of the United States'—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019), and The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020);

B. Vacate and set aside the challenged regulations;

C. Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

E. Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 26th day of March 2021.

UNIVERSITY OF NEW MEXICO
SCHOOL OF LAW CLINIC

Clifford J. Villa, WA Bar No. 45860

 /s/ Samuel L. Winder
Samuel L. Winder, NM Bar No. 5754

 /s/ Gabriel Pacyniak
Gabriel Pacyniak, DC Bar No. 1002548*

 /s/ Christopher Hall
Christopher Hall, UNM Clinical Law
Student**

 /s/ Jessica I. Martinez
Jessica I. Martinez, UNM Clinical Law
Student**

 /s/ Max J. Spivak
Max J. Spivak, UNM Clinical Law
Student**


1117 Stanford Drive NE
Albuquerque, NM 87131-0001
Telephone: (505) 277-5265
Email: villa@law.unm.edu
Email: winder@law.unm.edu
Email: pacyniak@law.unm.edu
Email: hallch@law.unm.edu
Email: martinjes@law.unm.edu
Email: spivakma@law.unm.edu

*Attorneys for Plaintiffs*

*D.N.M.LR-Civ. 83.3
** D.N.M.LR-Civ. 83.11

PUEBLO OF LAGUNA

 /s/ Kenneth Bobroff
Kenneth Bobroff, NM Bar No. 7874
Pueblo of Laguna
P.O. Box 194
Laguna, NM 87026
Telephone: (505) 459-4227
Email: kbobroff@pol-nsn.gov

 */s/ Colleen Adams*
Colleen Adams, CO Bar No. 54192
Pueblo of Laguna
P.O. Box 194
Laguna, NM 87026
Telephone: (505) 552-6654
Email: cadams@pol-nsn.gov

 /s/ James M. Burson
James M. Burson, NM Bar No. 12034
Pueblo of Laguna
P.O. Box 194
Laguna, NM 87026
Telephone: (505) 552-6654
Email: jburson@pol-nsn.gov

*Attorneys for Plaintiff Pueblo of Laguna*


PUEBLO OF JEMEZ

 /s/ David Yepa
David Yepa, NM Bar No. 5105
VanAmberg, Rogers, Yepa, Abeita,
Gomez & Wilkinson, LLP
5941 Jefferson Court NE, Suite B
Albuquerque, NM 87109
Telephone: (505) 242-7352
Email: dyepa@nmlawgroup.com

*Attorney for Plaintiff Pueblo of Jemez*

JS 44  (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Pueblo of Jemez<br>Pueblo of Laguna | See attached |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
see attached.

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government
      Plaintiff
- [ ] 3  Federal Question
      *(U.S. Government Not a Party)*
- [x] 2  U.S. Government
      Defendant
- [ ] 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place<br>of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place<br>of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a<br>Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment<br>   & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted<br>   Student Loans<br>   (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment<br>   of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product<br>   Liability<br>[ ] 320 Assault, Libel &<br>   Slander<br>[ ] 330 Federal Employers'<br>   Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product<br>   Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle<br>   Product Liability<br>[ ] 360 Other Personal<br>   Injury<br>[ ] 362 Personal Injury -<br>   Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury -<br>   Product Liability<br>[ ] 367 Health Care/<br>   Pharmaceutical<br>   Personal Injury<br>   Product Liability<br>[ ] 368 Asbestos Personal<br>   Injury Product<br>   Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal<br>   Property Damage<br>[ ] 385 Property Damage<br>   Product Liability | [ ] 625 Drug Related Seizure<br>   of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal<br>   28 USC 157<br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated<br>   New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets<br>   Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC<br>   3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and<br>   Corrupt Organizations<br>[ ] 480 Consumer Credit<br>   (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer<br>   Protection Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/<br>   Exchange |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | [ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/<br>   Accommodations<br>[ ] 445 Amer. w/Disabilities -<br>   Employment<br>[ ] 446 Amer. w/Disabilities -<br>   Other<br>[ ] 448 Education | **Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate<br>   Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee -<br>   Conditions of<br>   Confinement | [ ] 710 Fair Labor Standards<br>   Act<br>[ ] 720 Labor/Management<br>   Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical<br>   Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement<br>   Income Security Act<br><br>**IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration<br>   Actions | [ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff<br>   or Defendant)<br>[ ] 871 IRS—Third Party<br>   26 USC 7609 | [ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information<br>   Act<br>[ ] 896 Arbitration<br>[x] 899 Administrative Procedure<br>   Act/Review or Appeal of<br>   Agency Decision<br>[ ] 950 Constitutionality of<br>   State Statutes |

## V.  ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original
      Proceeding
- [ ] 2  Removed from
      State Court
- [ ] 3  Remanded from
      Appellate Court
- [ ] 4  Reinstated or
      Reopened
- [ ] 5  Transferred from
      Another District
      *(specify)*
- [ ] 6  Multidistrict
      Litigation -
      Transfer
- [ ] 8  Multidistrict
      Litigation -
      Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. § 702

Brief description of cause:
Unlawful agency action re-defining "waters of the United States" regulated under the Clean Water Act.

## VII.  REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION**
      UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  [ ] Yes  [x] No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*     JUDGE  See attached.     DOCKET NUMBER _____

DATE
March 26, 2021

SIGNATURE OF ATTORNEY OF RECORD
/s

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## CIVIL COVER SHEET ATTACHMENT

**Attorneys, Section I**

UNIVERSITY OF NEW MEXICO
SCHOOL OF LAW CLINIC

Clifford J. Villa, Washington Bar No. 45860
Gabriel Pacyniak, D.C. Bar No. 1002548*
Samuel Winder, New Mexico Bar No. 5754
Christopher Hall, UNM Clinical Law
Student**
Jessica Martinez, UNM Clinical Law
Student**
Max Spivak, UNM Clinical Law Student**

1117 Stanford Drive NE
Albuquerque, NM 87131-0001
Telephone: (505) 277-5265

Email: villa@law.unm.edu
Email: pacyniak@law.unm.edu
Email: winder@law.unm.edu
Email: hallch@law.unm.edu
Email: martinjes@law.unm.edu
Email: spivakma@law.unm.edu

*Attorneys for Plaintiffs*

\*D.N.M.LR-Civ. 83.3
\*\* D.N.M.LR-Civ. 83.11

PUEBLO OF JEMEZ

David Yepa, NM Bar No. 5105
VanAmberg, Rogers, Yepa, Abeita,
Gomez & Wilkinson, LLP
5941 Jefferson Court NE, Suite B
Albuquerque, NM 87109
Telephone: (505) 242-7352
Email: dyepa@nmlawgroup.com

*Attorney for Plaintiff Jemez Pueblo*

PUEBLO OF LAGUNA

Kenneth Bobroff, Bar No. 7874*
Colleen Adams, CO Bar No. 54192*
James M. Burson, NM Bar No. 12034

Pueblo of Laguna
P.O. Box 194
Laguna, NM 87026
Telephone: 505-552-6654
Email: kbobroff@pol-nsn.gov
Email: cadams@pol-nsn.gov
Email: jburson@pol-nsn.gov

*Attorneys for Plaintiff Laguna Pueblo*

**Defendants, Section I**

MICHAEL REGAN, in his official capacity
as Administrator of the United States of the
Environmental Protection Agency; UNITED
STATES ENVIRONMENTAL
PROTECTION AGENCY; TAYLOR N.
FERRELL, in his official capacity as Acting
Assistant Secretary of the Army for Civil
Works; UNITED STATES ARMY CORPS
OF ENGINEERS

**Related Cases, Section VIII**

Sr. District Judge Robert C. Brack,
Docket Number: 1:19-CV-00988-RB-SCY

District Judge Martha Vasquez
Docket Number: 2:20-CV-00602