**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| PUEBLO OF LAGUNA; PUEBLO OF JEMEZ, )<br><br>Plaintiffs, )<br><br>v. )<br><br>MICHAEL REGAN, in his official capacity )<br>as Administrator of the U.S. Environmental )<br>Protection Agency; U.S. )<br>ENVIRONMENTAL PROTECTION )<br>AGENCY, et al., )<br><br>Defendants. ) | Case No. 1:21-cv-277-WJ-KK |

**DEFENDANTS' OPPOSED MOTION FOR VOLUNTARY REMAND OF THE NWPR
WITHOUT VACATUR**

# EXHIBITS

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al*., <br><br> Defendants, <br><br> CHANTELL SACKETT; MICHAEL SACKETT, <br><br> Defendant-Intervenors. | Case No. 20-cv-10820-DPW |

## <u>DECLARATION OF RADHIKA FOX</u>

I, Radhika Fox, declare that the following statements are true and correct to the best of my knowledge and belief and are based on my personal knowledge, information contained in the records of the United States Environmental Protection Agency ("EPA" or "the Agency"), and information supplied to me by current EPA employees.

1. I am the Principal Deputy Assistant Administrator for the Office of Water in EPA. I have served in this position since January 2021.

2. As Principal Deputy Assistant Administrator, I am responsible for, and provide counsel to, the Administrator on policy, planning, program development and implementation, management, and control of the technical and administrative aspects of the Office of Water. I manage the Agency's programs under the Clean Water Act ("CWA"), Safe Drinking Water Act, and the Marine Protection, Research, and Sanctuaries Act.

3. Within EPA, the Office of Water has primary responsibility for the rulemaking process related to the CWA.

4. Within the Department of the Army ("Army"), the Office of the Assistant Secretary of the United States Army for Civil Works has primary responsibility for the rulemaking process related to the CWA.

5. These two offices have the responsibility of implementing the definition of "waters of the United States" regarding their respective CWA regulatory actions and programmatic activities.

6. In 2015, EPA and the Army (collectively "the agencies") promulgated a rule (the "Clean Water Rule") establishing a new definition of "waters of the United States"—a key term used to identify the jurisdictional scope of the CWA.

7. On April 21, 2020, the agencies, under the Trump Administration, promulgated the Navigable Waters Protection Rule (NWPR), which comprehensively revised regulations defining the term "waters of the United States."

8. The agencies, after completing a review of the NWPR, have decided to initiate another rulemaking to revise the term "waters of the United States." As described below, the Biden Administration's EPA and Army have substantial concerns about the lawfulness of aspects of the NWPR and the harmful effects of the NWPR on the nation's waters.

9. The agencies' review of the NWPR was at the direction of President Biden. On January 20, 2021, President Biden signed Executive Order 13990 ("EO 13990") on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis to pronounce the Administration's policy "to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; to reduce

greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore

and expand our national treasures and monuments; and to prioritize both environmental

justice and the creation of the well-paying union jobs necessary to deliver on these goals."

EO 13990 directed all Federal agencies to "immediately review and, as appropriate and

consistent with applicable law, take action to address the promulgation of Federal regulations

and other actions during the last 4 years that conflict with these important national objectives,

and to immediately commence work to confront the climate crisis." And "[f]or any such

actions identified by the agencies, the heads of agencies shall, as appropriate and consistent

with applicable law, consider suspending, revising, or rescinding the agency actions." The

order also specifically revoked Executive Order 13778 of February 28, 2017 (Restoring the

Rule of Law, Federalism, and Economic Growth by Reviewing the "Waters of the United

States" Rule), which had resulted in promulgation of the NWPR.

10. Pursuant to the direction in EO 13990, the agencies have carefully reassessed the

administrative record for and the legal and scientific basis of the NWPR. The agencies have

also thoroughly reviewed the challenges to the NWPR presented by the parties in the pending

litigation. The agencies have completed this assessment and decided to initiate rulemaking to

revise the term "waters of the United States." Among the factors that the agencies considered

are: the text of the CWA; Congressional intent and the objective of the CWA; U.S. Supreme

Court case law; the impacts resulting from the NWPR; concerns raised by stakeholders about

the NWPR, including implementation-related issues; the principles outlined in EO 13990;

and issues raised in ongoing litigation challenging the NWPR. As further described below,

the agencies have identified substantial concerns with the NWPR and have determined that

additional considerations should be given to certain aspects of the NWPR through notice-

and-comment rulemaking, including concern that when interpreting the jurisdictional scope of the CWA, the NWPR did not appropriately consider the effect of the revised definition of "waters of the United States" on the integrity of the nation's waters, as well as concern over the loss of waters protected by the CWA.

11. Congress enacted the CWA in 1972 with the statutory objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Section 1251(a) of Title 33, U.S. Code. One of the Act's principal tools in achieving the statutory objective is through its general prohibition on the discharge of pollutants to "waters of the United States," the statutory phrase that generally establishes the jurisdictional scope of the Act.

12. Certain statements in the NWPR preamble call into significant question whether the agencies' consideration of science and water quality impacts in developing the rule was consistent with these goals. For example, the agencies explicitly and definitively stated in numerous places in the NWPR administrative record that they did not rely on agency documents in the record that provided some limited assessment of the effects of the rule on water quality in determining the scope of the definition of "waters of the United States." *See, e.g.*, 85 Fed. Reg. at 22,332, 22,335 ("[T]he final rule is not based on the information in the agencies' economic analysis or resource and programmatic assessment.").

13. The agencies now believe that consideration of the effects of a revised definition of "waters of the United States" on the integrity of the nation's waters is a critical element in assuring consistency with the statutory objective of the CWA. *See, e.g.*, *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1468-69 (2020) ("*Maui*") (emphasizing the importance of considering the CWA's objective when determining the scope of the Act and finding that "[t]he Act's provisions use specific definitional language to achieve this result,"

including the phrase "navigable waters"). Based on a careful evaluation of the record of the NWPR, including the above-quoted statement, the agencies have substantial and legitimate concerns regarding the adequacy of consideration of the CWA's water quality goals in the development of the NWPR. As such, the agencies believe it is appropriate to reconsider these issues—and, in particular, the effects of the "waters of the United States" definition on the chemical, physical, and biological integrity of the nation's waters—in a new rulemaking.

14. In light of the text, structure, and legislative history of the Act, and *Maui* and other Supreme Court decisions, the agencies have concluded there must be some consideration of the effects of a revised definition of "waters of the United States" on the integrity of the nation's waters. Based on the record at the time the agencies promulgated the NWPR, significant concerns exist about the sufficiency of the agencies' consideration of the effects of the NWPR on the chemical, physical, and biological integrity of the nation's waters when determining the limits of the specific definitional language "waters of the United States" in the NWPR. For example, the agencies are concerned that the NWPR did not look closely enough at the effect ephemeral waters have on traditional navigable waters when the agencies decided to categorically exclude all ephemeral waters. New rulemaking will provide the agencies an additional opportunity to evaluate these issues and allow all interested stakeholders to contribute to this process through rulemaking comments and other public processes.

15. The agencies have also decided to initiate a new rulemaking in light of information regarding the impact of the NWPR on the scope of CWA jurisdiction informed by nearly a full year of implementation. Staff at EPA and the Army have reviewed approved jurisdictional determinations and identified indicators of a substantial reduction in waters covered under the NWPR compared to previous rules and practices. These indicators include an increase in

determinations by the Corps that waters are non-jurisdictional and an increase in projects for which CWA Section 404 permits are no longer required. The agencies have also found that preliminary jurisdictional determinations (through which applicants proceed with permitting as though all resources were jurisdictional) are much less common under the NWPR, indicating that fewer project proponents believe waters are jurisdictional from the start. Of the 40,211 individual aquatic resources or water features for which the Corps made approved jurisdictional determinations under the NWPR between June 22, 2020 and April 15, 2021, approximately 76% were found to be non-jurisdictional. Many of the non-jurisdictional waters are excluded ephemeral resources (mostly streams) and wetlands that are not adjacent under the NWPR. The agencies are aware of 333 projects that would have required Section 404 permitting prior to the NWPR, but no longer do under the NWPR. The agencies are also aware that this number is not the full universe of projects that no longer require Section 404 permitting under the NWPR, partly because to the extent that project proponents are not seeking any determinations for waters that the NWPR now excludes, such as ephemeral streams, the effects of such projects are not tracked in the Corps database. As a whole, the reduction in jurisdiction is notably greater than the deregulatory effects discussed in the rule preamble and the economic analysis case studies.

16. These changes have been particularly significant in arid states. In New Mexico and Arizona, for example, of over 1,500 streams assessed under the NWPR, nearly every one has been found to be a non-jurisdictional ephemeral resource, which is very different from the status of the streams as assessed under both the Clean Water Rule and the pre-2015 regulatory regime.[1]

---

[1] These non-jurisdictional ephemeral resources are predominantly ephemeral streams, but a small portion may be swales, gullies, or pools.

17. The agencies have heard concerns from a broad array of stakeholders, including states, tribes, scientists, and non-governmental organizations, that the reduction in the jurisdictional scope of the CWA is resulting in significant, actual environmental harms. These entities have identified specific projects and discharges that would no longer be subject to CWA protections because the waters at issue would no longer be jurisdictional. In many cases permit applications have been withdrawn. For example, stakeholders have raised concerns about dredge and fill activities on large swaths of wetlands in sensitive areas, in the floodplains of jurisdictional waters, or even within several hundred yards of traditional navigable waters, that are proceeding without CWA regulatory protection or compensatory mitigation. Stakeholders have also identified for EPA many other wetlands and streams, newly deemed non-jurisdictional, which are likely to be filled for commercial and housing developments, mines, water pipelines, and other forms of development without CWA oversight.

18. Projects are proceeding in newly non-jurisdictional waters in states and tribal lands where regulation of waters beyond those covered by the CWA are not authorized, and, based on available information, will therefore result in discharges without any regulation or mitigation from federal, state, or tribal agencies. *See* Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States" at 40 (Jan. 22, 2020) (indicating that a large number of states do not currently regulate waters more broadly than the CWA requires, and are "unlikely to increase state regulatory practices" following the NWPR). One project that stakeholders have identified for EPA is the construction of a high-pressure oil pipeline that would cut through a drinking water well field, which is expected to result in discharges to nearly 100 ephemeral streams that appear to be no longer jurisdictional under

the NWPR; another project is the construction of a mine that would destroy hundreds of previously jurisdictional wetlands, deemed non-jurisdictional under the NWPR, next to a National Wildlife Refuge.

19. Tribes in arid areas have also indicated that they will disproportionately suffer from the reduction in protections, including tribal lands that intersect or are within the New Mexico state boundary. Some tribes have estimated that the NWPR removes more than 80% of stream miles within their jurisdictions from CWA protections, amounting to more than 1,400 miles of streams. These tribes lack the authority and the resources to independently regulate surface waters within and upstream of their reservations, and therefore cannot protect their scarce waters from upstream dischargers, such as uranium and coal mines.

20. Ephemeral streams, wetlands, and other aquatic resources provide numerous ecosystem services, and there could be cascading and cumulative downstream effects from impacts to these resources, including but not limited to effects on water supplies, water quality, flooding, drought, erosion, and habitat integrity.[2] The agencies have substantial concerns about the consideration of these effects on the chemical, physical, and biological integrity of the nation's waters in the NWPR rulemaking process.

---

[2] U.S. Environmental Protection Agency, Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence (Final Report), EPA/600/R–14/475F (Washington, DC: U.S. Environmental Protection Agency (2015)). https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=296414.

I declare under penalty of perjury that the foregoing is true and correct, based on my

personal knowledge and on information provided to me by employees of the EPA.

Dated: 6/9/2021

Radhika Fox
Principal Deputy Assistant Administrator
Office of Water
U.S. Environmental Protection Agency

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, *et al*., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 20-cv-10820-DPW |
| v. | ) |
| | ) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al*., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| CHANTELL SACKETT; MICHAEL SACKETT, | ) |
| | ) |
| Defendant-Intervenors. | ) |

<u>**DECLARATION OF JAIME A. PINKHAM**</u>

I, Jaime A. Pinkham, declare that the following statements are true and correct to the best of my

knowledge and belief and are based on my personal knowledge, information contained in the

records of the Office of the Assistant Secretary of the Army for Civil Works ("Civil Works" or

"the Agency"), and information supplied to me by Civil Works employees under my supervision.

1. Currently, I am serving as the Acting Assistant Secretary of the United States Army for Civil

   Works. I have served in this position since April of this year.

2. As the Acting Assistant Secretary of the United States Army for Civil Works, my principal

   duty involves the overall supervision of the functions of the Department of the Army

   ("Army") relating to programs for conservation and development of national water resources,

   including flood control, navigation, shore protection, and related purposes. In particular, I

   establish policy direction for, and supervision of, Army functions relating to all aspects of the

   Civil Works program which is executed by the United States Army Corps of Engineers

   ("Corps").

3.  Within the United States Environmental Protection Agency ("EPA"), the Office of Water has primary responsibility for the rulemaking process related to the CWA.

4.  Within the Army, the Office of the Assistant Secretary of the United States Army for Civil Works has primary responsibility for the rulemaking process related to the CWA.

5.  These two offices have the responsibility of implementing the definition of "waters of the United States" regarding their respective CWA regulatory actions and programmatic activities.

6.  In 2015, EPA and the Army (collectively "the agencies") promulgated a rule (the "Clean Water Rule") establishing a new definition of "waters of the United States"—a key term used to identify the jurisdictional scope of the CWA.

7.  On April 21, 2020, the agencies, under the Trump Administration, promulgated the Navigable Waters Protection Rule (NWPR), which comprehensively revised regulations defining the term "waters of the United States."

8.  The agencies, after completing a review of the NWPR, have decided to initiate another rulemaking to revise the term "waters of the United States." As described below, the Biden Administration's EPA and Army have substantial concerns about the lawfulness of aspects of the NWPR and the harmful effects of the NWPR on the nation's waters.

9.  The agencies' review of the NWPR was at the direction of President Biden. On January 20, 2021, President Biden signed Executive Order 13990 ("EO 13990") on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis to pronounce the Administration's policy "to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who

disproportionately harm communities of color and low-income communities; to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals." EO 13990 directed all Federal agencies to "immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives, and to immediately commence work to confront the climate crisis." And "[f]or any such actions identified by the agencies, the heads of agencies shall, as appropriate and consistent with applicable law, consider suspending, revising, or rescinding the agency actions." The order also specifically revoked Executive Order 13778 of February 28, 2017 (Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the "Waters of the United States" Rule), which had resulted in promulgation of the NWPR.

10. Pursuant to the direction in EO 13990, the agencies have carefully reassessed the administrative record for and the legal and scientific basis of the NWPR. The agencies have also thoroughly reviewed the challenges to the NWPR presented by the parties in the pending litigation. The agencies have completed this assessment and decided to initiate rulemaking to revise the term "waters of the United States." Among the factors that the agencies considered are: the text of the CWA; Congressional intent and the objective of the CWA; U.S. Supreme Court case law; the impacts resulting from the NWPR; concerns raised by stakeholders about the NWPR, including implementation-related issues; the principles outlined in EO 13990; and issues raised in ongoing litigation challenging the NWPR. As further described below, the agencies have identified substantial concerns with the NWPR and have determined that

additional considerations should be given to certain aspects of the NWPR through notice-and-comment rulemaking, including concern that when interpreting the jurisdictional scope of the CWA, the NWPR did not appropriately consider the effect of the revised definition of "waters of the United States" on the integrity of the nation's waters, as well as concern over the loss of waters protected by the CWA.

11. Congress enacted the CWA in 1972 with the statutory objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Section 1251(a) of Title 33, U.S. Code. One of the Act's principal tools in achieving the statutory objective is through its general prohibition on the discharge of pollutants to "waters of the United States," the statutory phrase that generally establishes the jurisdictional scope of the Act.

12. Certain statements in the NWPR preamble call into significant question whether the agencies' consideration of science and water quality impacts in developing the rule was consistent with these goals. For example, the agencies explicitly and definitively stated in numerous places in the NWPR administrative record that they did not rely on agency documents in the record that provided some limited assessment of the effects of the rule on water quality in determining the scope of the definition of "waters of the United States." *See, e.g.*, 85 Fed. Reg. at 22,332, 22,335 ("[T]he final rule is not based on the information in the agencies' economic analysis or resource and programmatic assessment.").

13. The agencies now believe that consideration of the effects of a revised definition of "waters of the United States" on the integrity of the nation's waters is a critical element in assuring consistency with the statutory objective of the CWA. *See, e.g.*, *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1468-69 (2020) ("*Maui*") (emphasizing the importance of considering the CWA's objective when determining the scope of the Act and

finding that "[t]he Act's provisions use specific definitional language to achieve this result," including the phrase "navigable waters"). Based on a careful evaluation of the record of the NWPR, including the above-quoted statement, the agencies have substantial and legitimate concerns regarding the adequacy of consideration of the CWA's water quality goals in the development of the NWPR. As such, the agencies believe it is appropriate to reconsider these issues—and, in particular, the effects of the "waters of the United States" definition on the chemical, physical, and biological integrity of the nation's waters—in a new rulemaking.

14.  In light of the text, structure, and legislative history of the Act, and *Maui* and other Supreme Court decisions, the agencies have concluded there must be some consideration of the effects of a revised definition of "waters of the United States" on the integrity of the nation's waters. Based on the record at the time the agencies promulgated the NWPR, significant concerns exist about the sufficiency of the agencies' consideration of the effects of the NWPR on the chemical, physical, and biological integrity of the nation's waters when determining the limits of the specific definitional language "waters of the United States" in the NWPR. For example, the agencies are concerned that the NWPR did not look closely enough at the effect ephemeral waters have on traditional navigable waters when the agencies decided to categorically exclude all ephemeral waters. New rulemaking will provide the agencies an additional opportunity to evaluate these issues and allow all interested stakeholders to contribute to this process through rulemaking comments and other public processes.

15.  The agencies have also decided to initiate a new rulemaking in light of information regarding the impact of the NWPR on the scope of CWA jurisdiction informed by nearly a full year of implementation. Staff at EPA and the Army have reviewed approved jurisdictional determinations and identified indicators of a substantial reduction in waters covered under

the NWPR compared to previous rules and practices. These indicators include an increase in determinations by the Corps that waters are non-jurisdictional and an increase in projects for which CWA Section 404 permits are no longer required. The agencies have also found that preliminary jurisdictional determinations (through which applicants proceed with permitting as though all resources were jurisdictional) are much less common under the NWPR, indicating that fewer project proponents believe waters are jurisdictional from the start. Of the 40,211 individual aquatic resources or water features for which the Corps made approved jurisdictional determinations under the NWPR between June 22, 2020 and April 15, 2021, approximately 76% were found to be non-jurisdictional. Many of the non-jurisdictional waters are excluded ephemeral resources (mostly streams) and wetlands that are not adjacent under the NWPR. The agencies are aware of 333 projects that would have required Section 404 permitting prior to the NWPR, but no longer do under the NWPR. The agencies are also aware that this number is not the full universe of projects that no longer require Section 404 permitting under the NWPR, partly because to the extent that project proponents are not seeking any determinations for waters that the NWPR now excludes, such as ephemeral streams, the effects of such projects are not tracked in the Corps database. As a whole, the reduction in jurisdiction is notably greater than the deregulatory effects discussed in the rule preamble and the economic analysis case studies.

16. These changes have been particularly significant in arid states. In New Mexico and Arizona, for example, of over 1,500 streams assessed under the NWPR, nearly every one has been found to be a non-jurisdictional ephemeral resource, which is very different from the status

of the streams as assessed under both the Clean Water Rule and the pre-2015 regulatory regime.[1]

17. The agencies have heard concerns from a broad array of stakeholders, including states, tribes, scientists, and non-governmental organizations, that the reduction in the jurisdictional scope of the CWA is resulting in significant, actual environmental harms. These entities have identified specific projects and discharges that would no longer be subject to CWA protections because the waters at issue would no longer be jurisdictional. In many cases permit applications have been withdrawn. For example, stakeholders have raised concerns about dredge and fill activities on large swaths of wetlands in sensitive areas, in the floodplains of jurisdictional waters, or even within several hundred yards of traditional navigable waters, that are proceeding without CWA regulatory protection or compensatory mitigation. Stakeholders have also identified for EPA many other wetlands and streams, newly deemed non-jurisdictional, which are likely to be filled for commercial and housing developments, mines, water pipelines, and other forms of development without CWA oversight.

18. Projects are proceeding in newly non-jurisdictional waters in states and tribal lands where regulation of waters beyond those covered by the CWA are not authorized, and, based on available information, will therefore result in discharges without any regulation or mitigation from federal, state, or tribal agencies. *See* Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States" at 40 (Jan. 22, 2020) (indicating that a large number of states do not currently regulate waters more broadly than the CWA requires, and are "unlikely to increase state regulatory practices" following the NWPR). One

---

[1] These non-jurisdictional ephemeral resources are predominantly ephemeral streams, but a small portion may be swales, gullies, or pools.

project that stakeholders have identified for EPA is the construction of a high-pressure oil

pipeline that would cut through a drinking water well field, which is expected to result in

discharges to nearly 100 ephemeral streams that appear to be no longer jurisdictional under

the NWPR; another project is the construction of a mine that would destroy hundreds of

previously jurisdictional wetlands, deemed non-jurisdictional under the NWPR, next to a

National Wildlife Refuge.

19. Tribes in arid areas have also indicated that they will disproportionately suffer from the

reduction in protections, including tribal lands that intersect or are within the New Mexico

state boundary. Some tribes have estimated that the NWPR removes more than 80% of

stream miles within their jurisdictions from CWA protections, amounting to more than 1,400

miles of streams. These tribes lack the authority and the resources to independently regulate

surface waters within and upstream of their reservations, and therefore cannot protect their

scarce waters from upstream dischargers, such as uranium and coal mines.

20. Ephemeral streams, wetlands, and other aquatic resources provide numerous ecosystem

services, and there could be cascading and cumulative downstream effects from impacts to

these resources, including but not limited to effects on water supplies, water quality,

flooding, drought, erosion, and habitat integrity.[2] The agencies have substantial concerns

about the consideration of these effects on the chemical, physical, and biological integrity of

the nation's waters in the NWPR rulemaking process.

---

[2] U.S. Environmental Protection Agency, Connectivity of Streams and Wetlands to Downstream Waters: A Review
and Synthesis of the Scientific Evidence (Final Report), EPA/600/R–14/475F (Washington, DC: U.S.
Environmental Protection Agency (2015)). https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=296414.

I declare under penalty of perjury that the foregoing is true and correct, based on my

personal knowledge and on information provided by employees under my supervision.


Dated: June 9, 2021


Jaime A. Pinkham
Acting Assistant Secretary of the Army
for Civil Works
U.S. Department of the Army